**Duane C. PANKRATZ, Plaintiff and Appellee,**

v.

**Winston MILLER, Defendant and Appellant.**

**No. 15234.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 22, 1986.

Decided Feb. 25, 1987.

Rory M. Barth, Sioux Falls, George T. Qualley, Sioux City, Iowa, for plaintiff and appellee.

Sidney B. Strange, Strange & Palmer, Sioux Falls, for defendant and appellant.

SABERS, Justice.

Winston Miller (Winston), appeals the trial court's decision holding him liable for damages in a civil suit for alienation of affections. We reverse.

### Facts

Elke Pankratz (Elke), is the estranged wife of plaintiff Duane C. Pankratz (Duane), a veterinarian. The Pankratz's were married in July of 1967. They had five children, three of whom are still surviving. Elke was born in post-war Germany. Duane is a native of Freeman, South Dakota. The couple met when Duane was traveling and working in Europe. Elke initiated a divorce action in Turner County, South Dakota, in the summer of 1984. At present, no judgment and decree of divorce has been entered in this matter.

Winston and Duane grew up together in Freeman. They were friends during their formative years and participated in some of the same school and church activities. Although Winston visited Duane once while he was attending college in Ames, Iowa, they apparently drifted apart after high school.

Winston returned to South Dakota in the fall of 1982, and became employed as an insurance salesman with his brother. The Miller brothers contacted Duane toward the end of 1982 in an effort to sell him a policy. Duane agreed to purchase life insurance for Elke and the policy was ultimately sold in March, 1983. Winston met Elke for the first time during these negotiations.

In the spring of 1983, Elke decided to attend summer school for art classes at Augustana College in Sioux Falls, South Dakota. This decision was met with substantial resistance from Duane and the children, even though this was something Elke had wanted to do for quite some time.

Elke began commuting to school daily from Freeman. Later in the summer, she began spending one night a week at the Sioux Falls Airport Holiday Inn to lessen the commute, and afford her more time to study. In the fall of 1983, Elke took an apartment in Sioux Falls. According to her deposition testimony, she considered this a "separation" from her husband and only returned to Freeman on the weekends to see the children. In its memorandum opinion, the trial court specifically found that there was no evidence to establish that Winston had anything to do with Elke's decision to attend Augustana College or to take up residence in Sioux Falls.

Elke initiated contact with Winston at about the time she began summer school. She invited him to dinner at a Sioux Falls restaurant where she picked up the check. According to Winston's testimony, he expected to be meeting with *both* Elke and Duane on this occasion. During dinner, Elke told Winston that she had been unhappy with her marriage for many years, that there were problems, and she questioned him about life as a divorced, single person.

After this meeting, Elke continued to have contact with Winston at her request to discuss her problems, (marital and otherwise). Later in 1983, a sexual relationship developed between them. The first instance occurred when Elke invited Winston to her room at the Holiday Inn. Thereafter, their sexual liaisons occurred sporadically until the middle of 1984. Winston testified to having sexual relations with Elke approximately five or six times. Elke stated that sex was not the main focus of her friendship with Winston; she admitted that they were "intimate a few times;" and although she does not condone extramarital relationships, she stated that her "marriage had not been a marriage for many, many years." In fact, at the time of trial, Elke was dating another man from Bridgewater.

There was substantial defense evidence that the marriage between Duane and Elke had deteriorated past the point of reconciliation long before Winston's involvement. There was also substantial evidence presented through Duane's testimony that the marriage was not hopelessly beyond repair, but rather it was Winston's persuasive influence which enticed Elke away from her home and family.

The trial court entered Findings of Fact, Conclusions of Law, and a Judgment on October 31, 1985. Finding of Fact 11 states:

> Though there were problems in the marital relationship between DOC [Duane] and ELKE PANKRATZ, there was love and affection to form the basis of a reconciliation of the marriage. The seduction and sexual relationship of WINSTON MILLER with ELKE PANKRATZ destroyed the possibilities of reconciliation. WINSTON MILLER'S conduct

was wrongful with the result being to entice ELKE PANKRATZ away from the home and bed of DR. PANKRATZ. The deliberate acts of WINSTON MILLER caused the relationship of husband and wife to come to an end.

The court concluded that Winston's seduction and resulting sexual relationship with Elke interfered with, and destroyed the ability of Duane to reconcile and save his marriage. The trial court awarded Duane $10,000 in actual damages and $10,000 in exemplary damages.

### Winston's Claims

Winston raises two issues on appeal. First, he urges this court to judicially abolish alienation of affections as a legal cause of action. Secondly, Winston claims that the evidence overwhelmingly demonstrated that there was no causal connection between his conduct and Elke's loss of affection for her husband which had been alienated long before their involvement.

1. WHETHER THE COMMON-LAW TORT OF ALIENATION OF AFFECTIONS SHOULD BE ABOLISHED AS A LEGAL CAUSE OF ACTION

The right to recover under the doctrine of alienation of affections has its origin in the common law. *Hunt v. Hunt,* 309 N.W.2d 818, 820 (S.D.1981). This common law basis exists despite statutory codification.[1] *Id.* In *Hunt,* we abolished the common-law tort action for criminal conversation but preserved the tort of alienation of affections.[2] The national trend is toward the judicial or statutory abrogation of alienation of affections as a legal cause of action. *Id.* at 821–822 and cases cited therein; *Fundermann v. Mickelson,* 304

---

1. SDCL 20–9–7 provides:
   *Abduction and seduction forbidden by rights of personal relation.* The rights of personal relation forbid:
   (1) The abduction of a husband from his wife or of a parent from his child;
   (2) The abduction or enticement of a wife from her husband, of a child from a parent, or from a guardian entitled to its custody;
   (3) The seduction of a wife, daughter, or orphan sister.

SDCL 15–17–12 provides in part:
In an action for ... seduction, if the plaintiff recover[s] less than fifty dollars damages, he shall recover no more costs and disbursements than damages.

2. Three justices concurring and two justices holding the common-law tort action for alienation of affections should be abolished. *Hunt,* 309 N.W.2d at 819.

N.W.2d 790 (Iowa 1981) and cases cited therein.[3]

In his concurring opinion in *Hunt, supra,* Justice Dunn wrote:

> While I agree that criminal conversation should be abolished, I am convinced that the tort of alienation of affections should be preserved until repealed by legislative action. It is one thing to abolish an action in tort which is devoid of defenses and unjust. It is quite another to abolish a long-standing legislative and judicial intention to preserve the sanctity of marriage by providing a civil remedy, and where reasonable and just defenses are available to a defendant. ... I feel certain that a case will arise in the future where some party has so flagrantly broken up a stable marriage that we would rue the day that an alienation suit was not available to the injured party.

309 N.W.2d at 823.

■ We see no reason to deviate from this position and therefore preserve the cause of action for alienation of affections.

### 2. WHETHER THERE WAS A CAUSAL CONNECTION BETWEEN WINSTON'S CONDUCT AND WIFE'S LOSS OF AFFECTION FOR HUSBAND

■ The elements necessary to sustain a claim for alienation of affections are: (1) wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) a causal connection between such conduct and loss. *Hunt,* 309 N.W.2d at 820. The gist of the action is the malicious interference with the marriage relationship. *Monen v. Monen,* 64 S.D. 581, 584, 269 N.W. 85, 87 (1936). The loss of consortium is the actionable consequence of an action for alienation. *Holmstrom v. Wall,* 64 S.D. 467, 268 N.W. 423 (1936). Consortium is a right growing out of the marital relationship. This term includes the right of either spouse to the society, companionship, conjugal affections, and assistance of the other. *Morey v. Keller,* 77 S.D. 49, 51, 85 N.W.2d 57, 58 (1957). A loss or impairment of any such elements will sustain an action for alienation of affections. *Id.* However, if it appears there was no affection to alienate, recovery is precluded. *Trainor v. Deters,* 22 Ohio App.2d 135, 259 N.E.2d 131, 134 (1969).

We review the facts with these elements in mind. Throughout her deposition [4] testimony, Elke maintained that she had lost her love and affection for her husband many years before her involvement with Winston.[5] She stated that problems in her marriage were evident from the beginning; that Duane was a workaholic and a very possessive, jealous, and domineering per-

---

3. Claiming that the theory of recovery in an alienation suit is intrinsically flawed, the *Fundermann* court stated:

> ... That theory was rooted in ideas we have long since renounced, involving wives as property. The action has survived in the hope that it affords some protection to existing family relationships. But this lofty hope has proven illusory. Human experience is that the affections of persons who are devoted and faithful are not susceptible to larceny—no matter how cunning or stealthful. And it is folly to hope any longer that a married person who has become inclined to philander can be preserved within an affectionate marriage by the threat of an alienation suit. If we did pretend that a would-be paramour would be thereby dissuaded, a substitute is likely to be readily found.

304 N.W.2d at 791–792.

4. Elke did not testify in person at the trial. Her deposition was taken after the trial. The evidence suggests that Duane's threats prevented her from doing so. These threats were basically that he would have the press and TV stations at the trial and smear her name all over Sioux Falls.

5. Direct examination:

> \* \* \* \* \* \*
>
> *Counsel:* [H]ow would you characterize your relationship with your husband [from 1980 to the present time]?
> *Elke:* Our relationship was very strained by that time.... I lost my love and affection for my husband many years ago already. It's been longer ago than five years ago.
> Cross-examination:
> \* \* \* \* \* \*
> *Elke:* I respected him [Duane] businesswise, yes.
> *Counsel:* And when you filed the divorce action ... did you still have that love and respect?
> *Elke:* I still have some respect for Dr. Pankratz, but I do not love him. I have not loved Duane for about four, five years now. And I can say that very assured.

son who would not let her be her own person. She further stated that they strongly disagreed about religion and the manner in which Duane disciplined the children.[6]

Pertaining to their friendship and sexual relationship,[7] the evidence shows that Elke initiated contact with Winston. She sought out his company—Elke talked about her problems, Winston listened. The first time they were intimate, it was Elke who invited Winston up to her room. She sent him cards and gifts upon occasion; he did not reciprocate. They were not in love; Winston did not promise her any future relationship, nor did she make any such promises to him. Indeed, Elke was seeing another man at the time of trial.

The record demonstrates that Elke instigated and then voluntarily participated in the affair which ultimately developed with Winston.[8] It is undisputed that they had sexual relations. However, this fact is not sufficient to sustain an alienation suit where there is no evidence that Winston's actions caused Elke to separate from her husband.[9] On the contrary, the evidence shows that Elke's affections for Duane were alienated long before her involvement with Winston.[10]

The trial court found that by continuing the affair with Elke, Winston frustrated Duane's efforts to reconcile with her. However, the evidence shows that Duane elicited Winston's advice and further involved him in the Pankratz's marital problems. Duane often contacted Winston to question him about Elke's activities in Sioux Falls, apart from any involvement she had with Winston at the time. Winston claimed that Duane admitted in February of 1984 that the Pankratz marriage had been in trouble for a long time and that Elke had had a number of affairs. Duane claimed only one other. At this meeting, Winston encouraged Duane to seek professional marriage counseling and promised him that he would refrain from having

6. Although the testimony was conflicting, the evidence suggests that Duane is a member of a conservative, fundamental religion, that he often quotes scripture during informal conversation, forced his children to pray with him before he "disciplined" them with a rubber hose, and threatened Elke with it many times. Duane denied any excessive use of the hose and claimed that Elke agreed with these methods of disciplining the children.

7. In regard to feeling guilty about her relationship with Winston, Elke stated the following upon cross-examination:
*Counsel:* Well, do you feel good about the sexual relationship you had with Winston?
*Elke:* I don't feel any remorse when it came to the friendship.
　　*　　*　　*　　*　　*　　*
*Counsel:* ... Was there a question in your mind that maybe this wasn't the right thing to be doing?
*Elke:* If I would have had a normal marriage I would have never looked at a man twice.
　　*　　*　　*　　*　　*　　*
The circumstances [were] so different, I didn't feel like I had been married to Duane for the last three, four years.

8. *See: Annot.*, 19 A.L.R.2d 471, § 3, at 486–493 (1951) and cases cited therein:
Although the cases are by no means harmonious, the majority view appears to recognize that there is no liability upon a defendant in an action for alienation of affections, where the alienation or separation of the spouses is caused by the voluntary act of the alienated spouse rather than the wrongful conduct of the defendant.

9. *See supra* note 8; § 2, at 483:
Unless it is established that the defendant is the enticer or the one who produced or brought about the alienation or separation, the mere proof that one spouse and the defendant are maintaining improper relations is not sufficient to support an action by the other spouse for the alienation of his or her affections.

10. Upon cross-examination by Duane's lawyer, Winston stated:
*Counsel:* And what did [Elke] tell you was the reason why [she could not love Duane]?
*Winston:* As I understand it this is a woman who over the course of years has become very disenchanted because of the inattention, frequent or numerous and frequent business trips, someone who does not elevate her own self-esteem, someone who is always or most often casting judgment, preaching. She also is very adamant about what she describes as forcible rape.
　　*　　*　　*　　*　　*　　*
*Winston:* Perhaps the biggest thing of all was what she described as the constant downgrading of her position as a woman and a mother, as a person, with Duane's religious views.
　　*　　*　　*　　*　　*　　*

sexual relations with Elke. At trial, Winston admitted that he had relations with her again about two months after this meeting.

Winston apparently did little or nothing to prevent their continuing sexual relationship, despite Duane's repeated requests. Even assuming that Winston's actions encouraged Elke to continue the friendship, the record shows that by this time, Elke held no affection for Duane for Winston to alienate. *See: Trainor:* 259 N.E.2d at 134.

Duane's testimony upon every aspect of the Pankratz marriage, as well as every incident related to this lawsuit, was diametrically opposed to that of his wife. We recognize that deference is due the trial court's assessment of Duane's credibility. SDCL 15–6–52(a); *Wiggins v. Shewmake,* 374 N.W.2d 111, 114 (S.D.1985). However, a fair reading of the record indicates that in Duane's quest to portray himself as a model husband and the Pankratz marriage as one of wedded bliss, much of his testimony rings hollow. Since Elke did not personally appear before the trial court, we have reviewed her testimony as though presented here in the first instance. Consequently, the clearly erroneous rule of SDCL 15–6–52(a) does not apply. Elke's testimony is not burdened with the presumption in favor of the trial court's determination. *Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 474, 185 N.W.2d 677, 680 (1971). We have viewed it and are satisfied that Winston's claim has ample evidentiary support.

Even more important, and as noted in the Restatement Comments,[11] Winston's conduct must have been calculated from the outset to cause Elke's loss of affections for Duane. The acts must have been done for the very purpose of accomplishing this result. It is not enough that Winston should have known that continuing the affair might contribute to the diminution of Elke's affections, where her affections for Duane were alienated *before* she initiated the relationship with Winston. The record falls short of affirmative conduct by Winston which in fact played a substantial part in inducing the loss.

In *Pedersen v. Jirsa,* 267 Minn. 48, 125 N.W.2d 38 (1963),[12] the Minnesota Supreme Court reversed a finding that defendant was responsible for alienating the affections of plaintiff's wife. The court wrote:

> A wife conceivably may transfer her affections from her husband to another because of the latter's kindliness, attractiveness, desirability, financial superiority, or some other reason. Such motiva-

---

11. The comments to the Restatement (Second) of Torts § 683 (1976), discuss the required elements of intent and causation in an action for alienation of affections and state in part:

> \* \* \* \* \* \*

> g. *Necessity of active conduct.* In order for liability to arise for alienation of affections there must be active and affirmative conduct.... There must be some act on the part of the defendant intended to induce or accomplish the result. One does not become liable for alienation of affections, without any initiative or encouragement, merely by becoming the object of the affections that are transferred from a spouse. It is only when there is such active participation, initiative or encouragement on the part of the defendant that he or she has in fact played a substantial part in inducing or causing one spouse's loss of the other spouse's affections, that liability arises.

> h. *Purpose that spouse's affection may be diminished.* Not only must the actor have caused a diminution of one spouse's affections for the other by acts, but the acts must have been done

for the very purpose of accomplishing this result.... It is not enough that the actor as a reasonable person should have known that the acts might diminish one spouse's affection for the other. Indeed, it is not enough to realize that this will be the probable or even certain result of the acts if they were not done for the purpose of accomplishing the loss of affection....

> \* \* \* \* \* \*

> k. *Causal relation between defendant's conduct and loss of affections.* To constitute a tortious interference with the marriage relation under the rule stated in this Section, the actor's conduct must have been a substantial factor in the loss of affections. It is unnecessary that the acts be the sole cause of the loss. If there are other causes of the loss of affections ... there is no liability unless the actor's conduct has been a substantial factor in causing the loss.

12. The state of Minnesota has since abolished the cause of action for alienation of affections. *See:* Minn.Stat.Ann. § 553.01 (West Supp.1980).

tion for transfer of affections may be a substantial factor even though the defendant had nothing to do with it. *The gravamen of an action for alienation of affections is enticement. It is based on an intentional tort, not negligence.* The acts which lead to the loss of affection must be wrongful and intentional, calculated to entice the affections of one spouse away from the other.... The mere fact that a wife may become infatuated with a person other than her husband gives no rise for a cause of action for alienation of affections, in the absence of a showing that the other person intentionally and wrongfully caused the husband to lose his wife's affections. (emphasis added)

*Id.* at 43. In *Pedersen,* reversal was predicated upon the fact that the jury found the defendant liable even though he was simply a good friend whose company the wife came to prefer to that of her husband. *Id.*

■ Following the *Pedersen* rationale, there is no evidence here to suggest that Winston enticed Elke's affections away from her husband. Elke was a mature woman with children, alienated and separated from her husband, who chose to engage in sexual activity with someone other than her spouse. An affirmance of the trial court would serve to absolve Elke from responsibility for her actions in relation to her husband and Winston. This we cannot do. Simply stated, the evidence fails to support an action for alienation of affections because there was no causal connection between Winston's conduct and Elke's loss of affection for her husband.

Accordingly, the judgment is reversed.

WUEST, C.J., and FOSHEIM, Retired Justice, concur.

HENDERSON, J., concurs specially.

MORGAN, J., concurs in part and dissents in part.

MILLER, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HENDERSON, Justice (concurring specially).

As the majority opinion, in my mind, completely retries the facts of this case from our state capitol at Pierre, I feel compelled to write specially. This case was tried to the court, without a jury, on September 17 and 19, and October 7, 1985, with a decision first issued on October 10, 1985, by a most able and experienced trial judge who thereafter entered findings of fact, conclusions of law, and judgment on October 31, 1985. True, the testimony of Elke Pankratz was by deposition and the majority opinion espouses the correct scope of review on deposition testimony. *Ayres v. Junek,* 247 N.W.2d 488 (S.D.1976).

However, the majority opinion treats most lightly the scope of appellate review where a trial judge has tried a case and has observed the witnesses and heard the testimony from their mouths. Perhaps we should go back to the schoolhouse and remind ourselves of some of these rules. The credibility of witnesses and weight to be accorded their testimony and weight of evidence is for the trial court. *Nicolaus v. Deming,* 81 S.D. 626, 139 N.W.2d 875 (1966); *Lukens v. Zavadil,* 281 N.W.2d 78 (S.D.1979); *Scott v. Wagner,* 274 N.W.2d 266 (S.D.1979). Also, this Court in *Mulder v. Tague,* 85 S.D. 544, 186 N.W.2d 884 (1971), put forth the rule that a reviewing court is not at liberty to change findings where the trial court has resolved conflicts in the evidence.

By the majority opinion's own admissions, there was great conflict in the evidence in this case. Therefore, this reviewing court should not be at liberty to change the trial court's findings. We have repeatedly held that it is not our function to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. If it is a jury trial, it is the function of the jury to make those determinations; if it is a trial to the court, it is the function of the trial court to make those determinations. Determining whether a party having the burden of proof on an

issue has sustained such a burden, involves weighing the evidence and determining credibility of witnesses and it is a question for the trial court. *Hilde v. Flood*, 81 S.D. 25, 130 N.W.2d 100 (1964).

In *Hilde*, we also held that the trial court's findings of fact are presumptively correct and the burden is upon appellant to show error in said findings. Further, we have held that if there is sufficient evidence in the record to support the trial court's decision, the reviewing court will not disturb the trial court's finding. *McLaughlin Elec. Supply v. American Empire Ins.*, 269 N.W.2d 766 (S.D.1978); *City of Rapid City v. Hoogterp*, 85 S.D. 176, 179 N.W.2d 15 (1970). *See* SDCL 15-6-52(a).

When this Court applies the clearly erroneous standard in this case, our function is not to decide factual issues *de novo*.[*] The question is not whether this Court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been made. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). Do we find here, in the majority opinion's recitation, that findings of fact did not support the conclusions of law and judgment? *See Knodel v. Board of County Comm'rs*, 269 N.W.2d 386 (S.D.1978); *Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292 (S.D.1982). We have also said that our standard of review is to uphold the trial court *unless* its findings are "clearly erroneous." A finding is "clearly erroneous" when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made. *Dakota Harvestore v. South Dakota Dep't of Revenue*, 331 N.W.2d 828 (S.D.1983). In *In re Estate of Nelson*, 330 N.W.2d 151 (S.D.1983), and *Bennett v. Jansma*, 329 N.W.2d 134 (S.D. 1983), we reiterated that a finding of fact can only be reversed on a clearly erroneous standard.

Therefore, I strenuously object to a retrial, in the eyes of an appellate beholder, where there is such a sharp conflict of evidence and there is an absolute reversal of the findings of fact by the appellate beholder over the trial court judge who "heard and saw it all." This, then, is simply a factual appeal and no argument, to the contrary, can prevail against the above authorities. Appellant should not achieve a reversal on his factual appeal.

Appellant's second point is simply that the cause of action for alienation of affections should be abolished. In *Hunt v. Hunt*, 309 N.W.2d 818 (S.D.1981), I wrote that this common law tort should be abolished. My writing did not sustain a majority but was joined by Chief Justice Wollman, who is now a sitting judge on the Eighth Circuit Court of Appeals. My viewpoints were expressed quite fully in *Hunt* and it would serve little purpose to recite the various authorities which I previously relied upon for the abolition of this tort.

It is my opinion that a suit founded upon alienation of affections is often fraught with grave abuses. Often, it creates undue humiliation and embarrassment to families and persons who are free of wrongdoing. Many of these cases are predicated upon a vindication of a spouse's own shortcomings. Breakups in marriage are created by many factors and love is really not a property that may be stolen. It is, in my opinion, in the keeping of sound public policy to abrogate this tort. An action of alienation of affections inherently demeans the parties involved and the courts of law which preside over it. *See Fundermann v. Mickelson*, 304 N.W.2d 790 (Iowa 1981), which was cited in my writing in *Hunt*.

Therefore, although I disagree with the treatment of the factual issues/factual appeal by the majority opinion, I would reverse this case based upon the preservation of appellant's legal stance, namely, to re-

---

[*] Note that the majority opinion does not appear to seriously abide by the clearly erroneous standard of review, except to point out that this deferential standard of review does not apply to Elke's testimony. *See* majority opinion, at 548.

verse the damage award on a matter of law which was preserved on appeal.

MORGAN, Justice (concurring in part, dissenting in part).

Appellant raises two issues in this appeal: (1) The sufficiency of the evidence to sustain the trial court's decision; and (2) The abrogation of the cause of action for alienation of affection.

In his special concurrence, Justice Henderson points out in great detail the error in the application of our simplest standards of review as found in the majority opinion. I agree with his analysis on that issue and will not reiterate it. The majority has fallen prey to the Sirens' song urging us to jump into the jury box (or as in this case onto the trial bench) and try the factual issues anew. I prefer to accord the trial court the deference due and accordingly, I dissent on that issue.

I do agree with the majority disposition of the second issue and thereby depart from the writings of my brother Henderson. In fact, I am totally at a loss to reconcile his desire to strike down a long-standing common law remedy with his previous attacks on legislative attempts to "deadbolt and shackle our courtroom doors" evidenced by his writings in *McMacken v. State*, 320 N.W.2d 131 (S.D. 1982) (Henderson, J. dissenting), *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n.*, 349 N.W.2d 419 (S.D.1984), and *Zacher v. Budd Co.*, 396 N.W.2d 122 (S.D.1986) (Henderson, J. concurring). What happened to Article VI, § 20 of the South Dakota Constitution that "manifests the intention of our forefathers that our courts shall remain open for an injury done to a man's or woman's property, person, or reputation"? *Zacher, supra*, at 141. The only apparent distinction that I perceive is the absence of the deep pockets of an insurance carrier. I do not believe that this court should do by judicial fiat that which we have denounced the legislature for doing by statute. Under our writings we should support this com-

mon law remedy. *See Oien v. City of Sioux Falls*, 393 N.W.2d 286 (S.D.1986).