# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2857

_____

| | | |
|---|---|---|
| Richard M. Jones, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Todd V. Swanson, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 15, 2003

Filed: September 3, 2003

_____

Before BOWMAN and BYE, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

BYE, Circuit Judge.

A jury awarded Richard M. Jones $450,000 in compensatory damages and $500,000 in punitive damages against Todd V. Swanson in this diversity action for alienation of affection. Todd appeals the district court's denial of his motions for new trial and judgment as a matter of law. We affirm conditioned on Richard's acceptance of a remittitur order on the verdict.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

I

Donna Jones and Todd Swanson grew up a small rural South Dakota community. They became romantically involved for a short time in 1977 upon Donna graduating from high school. They rekindled the romance in 1978 and again dated for a short time. The relationship ended in 1978, and the two did not see one another for twenty years until 1998.

In the interim, Todd became an orthopaedic surgeon and moved to Las Vegas, Nevada. He married and raised a family. Donna met Richard Jones shortly after the relationship with Todd ended and was married to him in 1981. Donna and Richard have four children and settled in Sioux Falls, South Dakota. Richard worked as a hospital administrator at Sioux Valley Hospital where Donna also worked as a nurse.

By 1998, Donna believed she and Richard were no longer close. Donna confided to friends she was dissatisfied with her job and marriage. While she described her marriage at the trial as being "near perfect," she admitted telling friends she "loved Richard as the father of her children but not as a woman loves a man." In the months leading up to September 1998, Donna took to drinking with friends and staying out late. On one occasion in August 1998, she attended a party at a friend's house without Richard. Donna drank heavily and become very intoxicated. In the course of the evening she met Ted Ries, and in her intoxicated state became somewhat enamored of him. The two exchanged a few kisses and eventually ended up in bed together. Donna testified she awoke the next morning partially dressed and in bed with Ries, who was naked. Neither Ries or Donna could remember exactly how they ended up in bed together, but both indicated they did not believe they had engaged in intercourse. Ries testified they "fooled around" after going to bed and described Donna as flirtatious, overly friendly and said she did not act like a married woman. Donna returned home early the following morning and told Richard she had

stayed at her friend's home because she drank too much and did not want to drive. She did not tell Richard about the encounter with Ries.

Donna contacted Ries twice following the incident. The first time, about a week later, Donna called Ries and asked him out for a drink. Ries declined, having discovered Donna was married. Donna testified she called Ries to find out exactly what had happened. Donna called Ries again about six months later, asked him out for a drink, and told him his name might come up in her upcoming divorce proceeding. It was against this backdrop that Donna and Todd met again and rekindled their previous relationship.[2]

On September 23, 1998, Todd's father suffered a heart attack and was taken to Sioux Valley hospital. Todd's family came to the hospital and by chance Donna noticed them in the ER and stopped to visit. The next day, Donna visited the family again and ran into Todd who had arrived overnight. The two struck up a conversation, and Donna mentioned she was having a birthday the next day. Todd asked if he could buy her lunch and Donna agreed. The next day Donna and Todd met at a restaurant. Todd presented her with a birthday card and informed the waiter it was Donna's birthday. Todd also made arrangements for a special birthday dessert. Todd testified Donna talked about her dissatisfaction with her job and marriage during lunch. In particular, she complained she was not getting as much sex from her husband as she wanted. Todd also testified Donna rubbed her leg against his during lunch.

After lunch, Donna and Todd took a walk in a nearby park. As they walked, Todd put his arm around Donna. When they sat down on a bench, Todd put his hand

---

[2]The only contact between Donna and Todd between 1978 and 1998 was a telephone call Donna made to Todd in 1996 soliciting him to buy vitamins she was selling.

on her knee. Donna again voiced her dissatisfaction with her marriage, saying she "loved Richard as the father of her children but not as a woman loves a man." Donna invited Todd to kiss her and they kissed several times. Todd remarked he had made a "huge mistake" letting Donna go twenty years earlier, and Donna told Todd she had always loved him.

Todd returned to Las Vegas but about a week later the two spoke over the telephone. There was conflicting evidence at trial as to who placed the first call; both said the other called, but it is undisputed over the next several weeks Todd and Donna spoke hundreds of times.[3] Both expressed their love and affection for the other during the many calls and, among other things, they talked about meeting somewhere. Todd told Donna he was planning to attend a meeting in San Francisco and asked if she could meet him. Donna agreed and made the necessary arrangements, including paying for her own plane ticket. Donna told Richard she was going to meet a college friend.

Before leaving for San Francisco, Todd sent Donna a CD and told her to listen to a song entitled "I'll Go On Loving You." When she arrived at the airport, Todd was there to meet her and gave her a bouquet of flowers. They went to a hotel where Donna registered as "Mrs. Donna Swanson." Donna also booked a separate room under her name in case Richard called. Donna, however, stayed the entire weekend with Todd in his room. Over the course of the weekend, Todd bought Donna a number of gifts and also took her to some of the meetings he attended. At one of the meetings, Donna met Wolfgang Schweizer, the president of Plus Orthopedics. Schweizer and Donna discussed the possibility of her becoming a sales representative

---

[3]Telephone records show Donna placed approximately 386 calls and Todd placed 186 calls. Todd gave Donna access to a calling card so the calls would not show up on her bill and she would not have to pay for them.

for Plus Orthopedics and invited her to visit the company's European headquarters in December.

After San Francisco, Donna and Todd went back to exchanging telephone calls, cards and gifts. During their calls they talked about leaving their respective spouses and making a life together, including where they would live and how their children would react. Among other things, Todd promised Donna a "Brady Bunch" family and future. In cards to Donna, Todd told her how much he cared for and loved her and how much he looked forward to being with her again. He also expressed concern and guilt over the affair. "I love our closeness, but I am still very concerned about you and your kids, and continue to have feelings of guilt toward both our spouses." And, "I feel terrible that some unfortunate man may eventually lose you, but I am being selfish, and want you for myself. I look forward to that day."

In early November, at Todd's request, Donna met with a counselor to discuss divorce and how it would affect her children. The counselor testified Donna felt Richard was not meeting her emotional and physical needs and she was unhappy and confused. The counselor also testified he believed Donna was already on her way out of the marriage.

At about this time, Donna told Richard she had been invited to Europe by Plus Orthopedics to explore the possibility of future employment.[4] In mid-November, she told Richard she was contemplating divorce. Donna denied any involvement with another man and told Richard she was not sure she loved him anymore.

---

[4]Donna was concerned Richard would suspect something so she asked Todd to obtain a letter for her from Plus Orthopedics tendering an offer to visit its European headquarters. Todd obtained some Plus Orthopedics stationary, wrote a letter to Donna, and forged the signature of a Plus Orthopedics's representative. The representative later learned of the forgery but did not object. Instead, he provided Donna with a second letter bearing his actual signature.

Days later, Donna's sister-in-law and nephew were killed in a car accident. Todd, who was in Sioux Falls for Thanksgiving, attended the funeral. It was then Richard began to suspect something between Todd and Donna. After the funeral, Richard had to leave town and Donna invited Todd to spend the night at her home. Todd accepted. The two also spent one or more nights at Todd's hotel. A few days later, Donna admitted to Richard she was having an affair with Todd and they were planning to travel to Europe together. Before returning to Las Vegas, Todd and Donna met jointly with a counselor to discuss the ongoing relationship and concerns they had about their children.

In December 1998, Donna and Todd went to Europe as planned. The trip lasted 10 days and Todd and Donna stayed together each night. Plus Orthopedics paid for Donna's travel expenses but Todd paid for everything else. While in Switzerland, Donna and Todd visited a Swiss bank to discuss opening an account so Todd could hide some of his money prior to his anticipated divorce.

After their European vacation Todd and Donna began joint and individual counseling sessions to prepare for what lay ahead. In January, Donna moved out of the family home. Todd had encouraged her to get her own place so he could call whenever he wanted. After she moved out, Donna and Todd continued to talk and correspond. In January, she traveled to California to meet him at a medical convention where they spent two days and nights together. It was there, for the first time, Todd suggested ending the affair.

Todd testified he began having doubts about the affair and suggested they reconcile with their spouses. Todd testified he told Donna that Richard was a good man and father, and she needed to work on her marriage because their relationship was not going to work out. Todd's, emotions, however, proved fickle. He later sent Donna a Valentine's Day card telling her how much he loved her. And still later that

month, when Donna showed up unexpectedly at a convention he was attending, Todd became upset because he was there with his business partner.

In April 1999, Donna moved back home with Richard and they attempted counseling to save the marriage. On July 4, 1999, Richard gave Donna a diamond ring and begged her to stay and work things out. Later that month, when Todd returned to Sioux Falls for his sister's wedding, Donna contacted him and asked to meet at a local park. The two had a picnic lunch together and Donna suggested sex in the park. Todd refused, but later dropped by Donna's house while out jogging. Todd contends he stopped by because he was concerned about Donna after he refused her invitation for sex. Todd, however, knew Richard was away and he and Donna were again intimate in her bedroom.

After Todd's trip to Sioux Falls in July, the relationship continued to cool until November 1999, when Donna flew to Seattle, Washington. Donna told Richard she was going to meet a friend but was in fact going to meet Todd. Once again, Todd and Donna stayed together in Todd's hotel room. This was the last time Todd and Donna were intimate together. Afterwards, Todd told Donna to go home and reconcile with her husband because it was not going to work out. Instead of flying home, Donna flew to San Diego where she planned to reconnect with Todd who was attending another seminar. Todd, however, flew first to Las Vegas and picked up two of his children. When he arrived in San Diego, he left a message telling Donna he would not be able to meet her. Donna was not dissuaded. Instead she waited for Todd at the airport in San Diego because "she wanted [him] to see [her] one more time."

In May 2000, Richard filed suit against Todd for alienation of affection. Donna moved out of the family home permanently in June 2000, and Richard sued for divorce on August 9, 2000. The tort claim was tried to a jury beginning February 5, 2002. The jury returned a verdict in favor of Richard and awarded $450,000 in actual damages and $500,000 in punitive damages. Todd moved for judgment as a

matter of law and for a new trial.  The district court denied Todd's motions and he appeals.

On appeal, Todd argues 1) there was insufficient evidence to prove the tort of alienation of affection, 2) there was no causal connection between the affair and the breakup of the marriage, 3) the district court improperly instructed the jury regarding the elements and defenses applicable to the tort of alienation of affection, 4) the district court improperly excluded evidence of Richard's post-breakup but pre-divorce extra-marital relationship, and 5) the compensatory and punitive damages awards were unwarranted by the evidence and excessive.[5]

II

A.   Sufficiency of the evidence offered to prove alienation of affection

Todd argues there was insufficient evidence to show he intended to alienate Donna's affections or that his actions caused the breakup of the marriage.  He contends the district court erred in denying his motion for judgment as a matter of law, and alternatively, argues the district court abused its discretion by denying his motion for a new trial.

---

[5]Todd also complains the tort of alienation of affection is an anachronism and points out its continued viability as a legitimate cause of action has been roundly criticized.  See Hunt v. Hunt, 309 N.W.2d 818, 821 (S.D. 1981).  The propriety of South Dakota's decision to recognize alienation of affection as a tort claim is not an issue for this court.  Despite repeated invitations, the Supreme Court of South Dakota has refused to judicially abolish the cause of action.  See Veeder v. Kennedy, 589 N.W.2d 610, 613-16 (S.D. 1999).  Thus, Todd's arguments against the cause of action provide no assistance to us in resolving the issues presented on appeal.

We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court. Keenan v. Computer Assocs. Int'l, 13 F.3d 1266, 1268 (8th Cir. 1994). A motion for judgment as a matter of law presents a legal question to the district court and us on appeal: "[W]hether there is sufficient evidence to support the jury's verdict." White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992). We view the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Keenan, 13 F.3d at 1268. The legal standard requires 1) all direct factual conflicts must be resolved in favor of the plaintiff, 2) all facts in support of the plaintiff that the evidence tended to prove must be assumed, and 3) the plaintiff must be given the benefit of all reasonable inferences. Hopson v. Fredericksen, 961 F.2d 1374, 1379 (8th Cir. 1992). A grant of judgment as a matter of law is proper only if the evidence viewed according to this standard would not permit "reasonable jurors to differ as to the conclusions that could be drawn." Dace v. ACF Indus., Inc., 722 F.2d 374, 375 (8th Cir. 1983).

We review for abuse of discretion the district court's denial of a motion for a new trial. Keenan, 13 F.3d at 1269. When "the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (internal quotation omitted). When reviewing a district court's decision to deny a motion for new trial, "we give great deference to its judgment, because the district court has the benefit of hearing testimony and observing the demeanor of witnesses throughout the trial." Bonner v. ISP Techs., Inc., 259 F.3d 924, 932 (8th Cir. 2001) (citation omitted).

The elements of a claim for alienation of affection are 1) wrongful conduct of the defendant, 2) loss of affection or consortium, and 3) a causal connection between the wrongful conduct and the loss of affection or consortium. Hunt, 309 N.W.2d at 820. The essence of the action is malicious interference with the marriage

relationship, <u>Monen v. Monen</u>, 269 N.W. 85, 87 (S.D. 1936), and a loss of consortium is the actionable consequence of an action for alienation of affection. <u>Holmstrom v. Wall</u>, 268 N.W. 423, 424 (S.D. 1936). Consortium is a right growing out of the marital relationship, and includes the right of either spouse to the society, companionship, conjugal affection, and assistance of the other. <u>Morey v. Keller</u>, 85 N.W.2d 57, 58 (S.D. 1957). "A loss or impairment of any such elements will sustain an action for alienation of affection." <u>Id.</u> "However, if it appears there was no affection to alienate, recovery is precluded. <u>Pankratz v. Miller</u>, 401 N.W.2d 543, 546 (S.D. 1987) (citing <u>Trainor v. Deters</u>, 259 N.E.2d 131, 134 (Ohio Ct. App. 1969)).

> A wife conceivably may transfer her affection from her husband to another because of the latter's kindliness, attractiveness, desirability, financial superiority, or some other reason. Such motivation for transfer of affection may be a substantial factor even though the defendant had nothing to do with it. *The gravamen of an action for alienation of affection [therefore] is enticement. It is based on an intentional tort, not negligence.* The acts which lead to the loss of affection must be wrongful and intentional, calculated to entice the affection of one spouse away from the other. . . . (emphasis added)

<u>Pankratz</u>, 401 N.W.2d at 548-49 (quoting <u>Pedersen v. Jirsa</u>, 125 N.W.2d 38, 43 (Minn. 1963)).

> It also appears to be the general rule that actual intent to alienate the affection of the spouse of another need not necessarily be shown if defendant's conduct is inherently wrong and tends to, and does, have that effect. In other words every person is presumed to intend the consequences of his own voluntary acts.

<u>Pearsall v. Colgan</u>, 76 N.W.2d 620, 621 (S.D. 1956).

Todd argues the evidence showed the marriage between Donna and Richard was over before he arrived on the scene and his actions did not cause the alienation

of Donna's affection. In other words, Todd argues his actions were not the proximate cause of Donna's loss of affection for her husband. See Pankratz, 401 N.W.2d at 546 (holding there can be no recovery against a defendant if it appears there was no affection to alienate).

There was considerable evidence tending to show the marriage was on precarious footing before Todd arrived on the scene. In the months leading up to the affair, Donna repeatedly expressed dissatisfaction with her marriage and frequently stayed out late drinking with friends. The encounter with Ries further illustrates the uncertainty of the marriage's future, and seriously undermines Donna's testimony claiming she loved Richard. Finally, Donna's counselor testified he met with Donna in November 1998, just as the affair was beginning, and Donna was already on her way out of the marriage.

There was, however, also evidence suggesting the marriage may have survived or at very least Donna still had affection for Richard. Donna testified the marriage had been near perfect and minimized the problems leading up to the affair. As the affair wound down, Donna moved back home with Richard and started marriage counseling in an attempt to save the relationship. Despite Donna's attempts to reconcile with Richard, Todd continued to pursue the relationship. Clearly Donna was dissatisfied with the marriage, but the evidence was sufficient for the jury to conclude she harbored affection for Richard which was alienated as a result of Todd's involvement.

Todd also argues he was not solely to blame for the affair. Rather, Donna was infatuated with him and pursued the relationship with even greater enthusiasm than he. Richard's cause of action is not dependent upon finding Donna was an unwilling participant in the affair. It could be argued Donna's willingness to become entangled in the affair demonstrates she had no affection for Richard or Todd's conduct was not the proximate cause of her loss of affection. But the jury concluded Donna still

-11-

loved Richard despite problems in their marriage and would have continued to love him if Todd had not interjected himself. "To justify a recovery by plaintiff in this action, the evidence must be sufficient to show that the wife was induced to abandon the husband by some active and direct interference on the part of defendant." Pearsall, 76 N.W.2d at 622 (citation omitted).

Along these same lines, Todd argues Donna was infatuated with him and South Dakota law does not allow a recovery for alienation of affection when the loss of affection results from a wife's infatuation. Pankratz, 401 N.W.2d at 548-49. Todd, however, oversimplifies the holding in Pankratz. The Pankratz court indicated infatuation - by itself - is not a basis for awarding damages because the "*gravamen of an action for alienation of affection is enticement*." Id. (quoting Pedersen, 125 N.W.2d at 38). Thus, evidence of infatuation may be offered to prove the absence of wrongful conduct or to demonstrate a lack of causation, but it does not obviate a defendant's wrongful conduct. Here, the jury was free to conclude Donna was infatuated but left Richard because of Todd's active enticement.

Todd also argues he never intended to harm Richard. The intent to inflict harm, however, is not an element of the tort. The loss to Richard was the natural consequence of Todd's attempts to win over Donna's love, and every person is presumed to intend the consequences of his own voluntary acts. Pearsall, 76 N.W.2d at 621. The jury was free to conclude Todd knew or should have known his actions would be harmful to Richard irrespective of his desire to cause harm.

Viewing this evidence in the light most favorable to the verdict, Keenan, 13 F.3d at 1268, it cannot be said there was insufficient evidence to support the jury's verdict. Nor do we conclude the district court abused its discretion in denying the motion for new trial based on sufficiency of the evidence.

-12-

B.    Jury instructions

Todd argues the district court erred when it refused to instruct the jury on infatuation.  Todd proposed the following instruction:

The mere fact that a wife may become infatuated with a person other than her husband gives no rise for a cause of action for alienation of affection, in the absence of a showing that the other person intentionally and wrongfully caused the husband to lose his wife's affection.

Appellant's App. at 17.

Todd argues the instruction is based on language taken directly from Pankratz, 401 N.W.2d at 549, and the court's refusal to give the instruction deprived him of a viable defense.  We disagree.

The standard for reviewing alleged errors in jury instructions is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.  The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case.  This court will reverse on the basis of instructional error only if it finds the error affected the substantial rights of the parties.  White v. Honeywell, Inc., 141 F.3d 1270, 1278 (8th Cir. 1998) (internal citations and quotations omitted).  "In diversity cases the substance of jury instructions is a matter governed by the applicable state law."  Fox v. Dannenberg, 906 F.2d 1253, 1258 (8th Cir. 1990).  Accordingly, the jury instructions, when read as a whole, must fairly and adequately present the relevant state law.  Walton Gen. Contractors, Inc. v. Chicago Forming, Inc., 111 F.3d 1376, 1382 (8th Cir. 1997).

The jury was instructed it had to find Todd intentionally acted to deprive Richard of Donna's affection or Todd's inherently wrongful conduct caused Donna's affection to be alienated. Appellant's App. at 26. The jury was further instructed it had to find "[t]hat the [wrongful] acts of the defendant were a proximate cause of the loss of affection . . ." Id. at 25. Todd argues the district court's refusal to give the additional instruction on infatuation deprived him of a defense to the claim.

We do not doubt Donna was infatuated with Todd. We do not, however, interpret Pankratz as vitiating Todd's wrongful conduct and barring Richard's claim because of Donna's infatuation. Rather, Pankratz merely recognizes that evidence of infatuation may prove the absence of wrongful conduct or demonstrate a lack of causation. Here, the jury was properly instructed on the elements of alienation of affection and proximate cause. Thus, we find no error.

Next, Todd argues the district court erred when it refused to instruct the jury that "[i]n an alienation of affection case, it must appear that defendant was the active or aggressive party." See Pearsall, 76 N.W.2d at 622. Todd's requested instruction accurately quotes Pearsall, but cases subsequent to Pearsall suggest the language is no longer viable law (if it ever was) or its application is limited to Pearsall. Plaintiffs have routinely been allowed to recover for alienation of affection even when the errant spouse was a willing if not co-equal participant in the affair. See Veeder, 589 N.W.2d at 613. The jury was instructed it had to find Donna felt some affection for Richard before the affair began. Appellant's App. at 28. The jury was also instructed Todd had to have acted wrongfully, as opposed to passively accepting an invitation from Donna. Id. at 26. Those instructions left Todd free to argue Donna's willingness to become involved in the affair and her aggressive pursuit of him proved she did not love Richard and Todd's conduct was not the cause of her loss of affection. We conclude Pearsall does not support Todd's proposed instruction excusing a defendant's conduct if he was less aggressive.

-14-

Todd's final claim of instructional error relates to the district court's rejection of his instruction requiring the jury to find Todd's actions were "intentional and malicious." Instead, the court chose to instruct the jury using an instruction approved in <u>Veeder</u>, 589 N.W.2d at 618-19 (approving an instruction indicating the jury was to find the defendant acted wrongfully). Because the instruction given by the district court was essentially identical to the instruction given in <u>Veeder</u>, we find no error in its use.

### C.     Richard's post-affair/pre-divorce extra-marital affair

Sometime after Richard filed for divorce but before the divorce was finalized, he had an extra-marital affair. The district court excluded evidence of the affair because Richard did not claim damages for loss of sexual relations. The district court also concluded the evidence, even if marginally relevant to other issues, would be more prejudicial than probative. Todd contends exclusion of the evidence warrants a new trial.

We review the district court's rejection of evidence as irrelevant for an abuse of discretion, <u>Laubach v. Otis Elevator Co.</u>, 37 F.3d 427, 428-29 (8th Cir. 1994), and will grant a new trial on the basis of incorrect rulings only if a different outcome is likely. <u>EEOC v. HBE Corp.</u>, 135 F.3d 543, 551 (8th Cir. 1998).

Under Rule 403 of the Federal Rules of Evidence, the district court was required to weigh the probative value of the evidence against the danger of unfair prejudice, and was empowered to exclude this evidence only if its probative value was substantially outweighed by the danger of unfair prejudice. A trial court's ruling as to the admissibility of such evidence will not be disturbed unless there is a clear and prejudicial abuse of discretion. <u>Radtke v. Cessna Aircraft Co.</u>, 707 F.2d 999, 1001 (8th Cir. 1983) (citation omitted).

-15-

We have some misgivings about whether evidence of Richard's affair was irrelevant. The evidence suggests he too was unhappy and might be relevant to the issue of what love and affection was present in the marriage. On the other hand, Richard's affair did not happen until his marriage to Donna was clearly over. Thus, while it may have been remotely relevant, we agree the probative value was substantially outweighed by the prejudicial effect of the evidence.

As concerns the jury's finding of liability, we find no error or abuse of discretion in the district court's denial of Todd's motions for judgment as a matter of law or new trial, and affirm.

D.    Damages

Todd next argues the award of $450,000 in compensatory damages was excessive and resulted from passion and prejudice.

Although the appropriateness of a new trial is a federal procedural question decided by reference to federal law, Pitts v. Electro-Static Finishing, Inc., 607 F.2d 799, 802 (8th Cir. 1979), when determining if a state law claim damage award is excessive, state case law guides our inquiry. England v. Gulf & Western Mfg. Co., 728 F.2d 1026, 1029 (8th Cir. 1984). Under South Dakota law, a jury's verdict should not be set aside except in those extreme cases where it is the result of passion or prejudice or where the jury has palpably mistaken the rules of law by which damages in a particular case are to be measured. Itzen v. Wilsey, 440 N.W.2d 312, 313-14 (S.D. 1989) (citing S.D. Codified Laws § 15-6-59(a)(5)).

Our research has uncovered no comparable South Dakota verdicts in alienation of affection claims. In a recent case, Veeder, 589 N.W.2d at 613-16, a jury awarded $65,000 in actual damages and $200,000 in punitive damages. Both awards were upheld. Here, the compensatory award of $450,000 is considerably more generous.

We recognize a South Dakota jury might reasonably place a high value on the relationship, but ultimately the evidence of Donna's pre-affair conduct and her dissatisfaction with the marriage undermines Richard's claim for damages. Accordingly, we conclude the evidence does not support the $450,000 award of compensatory damages and must be reduced or a new trial ordered. Consistent with our authority to order a remittitur on appeal, Rustenhaven v. Am. Airlines, Inc., 320 F.3d 802, 807 (8th Cir. 2003), we conditionally affirm the judgment entered on the verdict, subject to Richard's acceptance of a remittitur judgment in the amount of $150,000 for compensatory damages.

Todd next argues there was insufficient evidence to justify an award of punitive damages, and alternatively, the award of punitive damages was excessive.

S.D. Codified Laws § 21-3-2 allows for punitive damages if there is evidence of "oppression, fraud, or malice." Kjerstad v. Ravellette Publ'ns, Inc., 517 N.W.2d 419, 425 (S.D. 1994). Malice may be either actual or presumed. Id. (citation omitted). Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure another and motivated by hatred or ill will. Presumed malice need not be motivated by hatred or ill will, but is present when a person acts willfully or wantonly to the injury of others. It implies the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations. Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991). Presumed malice can be shown by demonstrating a disregard for the rights of others. Flockhart v. Wyant, 467 N.W.2d 473, 475 (S.D. 1991).

Though not overwhelming, we conclude the evidence was sufficient for the jury to reasonably find Todd acted willfully or wantonly and his actions demonstrated a disregard for Richard's rights. Accordingly, we affirm the trial court's denial of Todd's motions for judgment as a matter of law and a new trial as they relate to the

-17-

jury's award of punitive damages. We next consider whether the award of punitive damages was excessive.

Under South Dakota law, the decision to award punitive damages and the amount rests with the jury. Schaffer v. Edward D. Jones & Co., 552 N.W.2d 801, 809 (S.D. 1996). "Unless the verdict is so large as to clearly indicate that it must have been given under the influence of passion or prejudice, it should stand." Id. at 810 (citation omitted). South Dakota has adopted a five-factor test to determine whether an award of punitive damages is appropriate or excessive. Id. (citation omitted). In applying South Dakota precedent we consider,

1. The amount allowed in compensatory damages,
2. The nature and enormity of the wrong,
3. The intent of the wrongdoer,
4. The wrongdoer's financial condition, and
5. All of the circumstances attendant to the wrongdoer's actions.

Id.

The first factor is the amount of the compensatory damages and its relationship or ratio to the amount of punitive damages. The amount of punitive damages awarded must bear a reasonable relationship to the compensatory damages. Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 504 (S.D. 1997) (citation omitted). Here the ratio was essentially 1 to 1. South Dakota courts have upheld awards with a substantial difference in ratios. See, e.g., Schaffer, 552 N.W.2d at 810 (30 to 1). To the extent ratio comparisons are of any value, this factor weighs in favor affirming the award.

The second factor is the nature and enormity of the wrong. The jury determined this was an intentional attack on Richard's right to Donna's affection. A divorce resulted which also affected the Jones's four children. Under similar facts,

-18-

the South Dakota Supreme court held an award of $200,000 in punitive damages was not excessive. Veeder, 589 N.W.2d at 622. Again, however, the $500,000 award here is considerably more generous than the amount awarded in Veeder. We recognize Todd pursued Donna, but Donna was a most willing participant and the marriage was in jeopardy before Todd arrived. We conclude, therefore, this factor weighs in favor of reducing the award.

> The third factor is the intent of the wrongdoer.
>
> From intent, we determine "the degree of reprehensibility of the defendant's conduct," which is viewed as probably the most important indication of the reasonableness of the punitive damage award. Schaffer II, 1996 SD 94 at ¶ 32, 552 N.W.2d at 812 (citing BMW of N. Am. v. Gore, 517 U.S. 559, 575) [(1996)]. Trickery and deceit are more reprehensible than negligence. Id. Of a more serious nature would be those acts which result in injury to persons through indifference to and reckless disregard for the health or safety of other. See BMW, 517 U.S. at 576. The most reprehensible from the intent point of view would be an intentional malicious assault or attack against a person.

Grynberg, 573 N.W.2d at 506 (footnote omitted).

"Husband and wife contract toward each other obligations of mutual respect, fidelity, and support." S.D. Codified Laws § 25-2-1. "Here the acts are of the most serious nature as they are intentional towards [Richard's] marriage with all the corresponding effects, albeit not malicious." Veeder, 589 N.W.2d at 622. In Veeder, the South Dakota Supreme court held "[p]unitive damages may properly be imposed to further a State's legitimate interests in not only punishing unlawful conduct but also to deter its repetition." Id. (quoting Schaffer, 552 N.W.2d at 813 (citing BMW, 517 U.S. at 568)). We are mindful of the state's interest in protecting the marital relationship and find this factor weighs in favor of an award of punitive damages. We also note, however, Todd has repeatedly expressed remorse over the affair. See Schaffer, 552 N.W.2d at 813 (upholding an award of punitive damages where the

defendant expressed no remorse for his actions).  Therefore, while some award of punitive damages was warranted, we are  unconvinced the circumstances of this case justify an award of $500,000.

Todd focuses most of his arguments on factor four, i.e., the award was excessive in light of his ability to pay.  Todd argues the punitive damage award of $500,000 is in excess of 20% of his net worth of $2.3 million.[6]  He further argues the entire award - compensatory damages plus punitive damages - nearly exceeds his annual income and represents nearly ½ of his total assets.

Todd's annual income of over $1,000,000 is substantial.  But the $500,000 punitive damages award represents nearly half of his annual income and nearly 25 percent of his net worth.  This factor suggests the award is excessive and favors reducing the verdict.

Finally, we look to all other relevant circumstance of the case.  For example, are there other sanctions available, either criminal or civil.  Veeder, 589 N.W.2d at 622.  Here, we find none.  Other circumstances, however, as discussed herein, lead us to conclude the award of punitive damages was not supported by the evidence and must be reduced or a new trial ordered.  Consistent with our authority to order a remittitur on appeal, Rustenhaven, 320 F.3d at 807, we conditionally affirm the judgment entered on the verdict, subject to Richard's acceptance of a remittitur judgment in the amount of $250,000 for punitive damages.

---

[6]Todd argues the size of the verdict should be compared to ½ of his and his wife's combined worth and his wife's ½ share of their combined assets should not be subject to the verdict.  We reject Todd's arguments, however, because Nevada law holds community property is subject to a spouse's debt irrespective of whether both spouses were a party to the action.  Randono v. Turk, 466 P.2d 218, 224 (Nev. 1970).

## III

We conditionally affirm the judgment entered on the verdict in favor of Richard, subject to his acceptance of a remittitur judgment in the amount of $150,000 for compensatory damages *and* a remittitur judgment in the amount of $250,000 for punitive damages. Absent Richard's acceptance of remittitur, we reverse and remand for a new trial on his compensatory and punitive damages claims.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.