# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2604

_____

| | | |
|---|---|---|
| Goss International Corporation, formerly known as Goss Graphic Systems, Inc., a Delaware corporation, | * * * * | |
| Plaintiff/Appellee, | * * | |
| v. | * * | |
| Man Roland Druckmaschinen Aktiengesellschaft, a German corporation; Man Roland, Inc., a Delaware corporation; Koenig & Bauer Aktiengesellschaft, a German corporation; KBA North America, Inc., a Delaware corporation, | * * * * * * * | Appeal from the United States District Court for the Northern District of Iowa. |
| Defendants, | * * | |
| Tokyo Kikai Seisakusho, Ltd., a Japanese corporation; TKS (U.S.A.), Inc., a Delaware corporation, | * * * * | |
| Defendants/Appellants, | * * | |
| Mitsubishi Heavy Industries, Ltd., a Japanese corporation; MLP U.S.A., Inc., a Delaware corporation, | * * * * | |
| Defendants, | * * | |
| _____ | * * | |

The Government of Japan,        *

                                             *

    Amicus on Behalf of Appellants.  *

————————

Submitted: March 4, 2005
Filed: January 23, 2006

————————

Before RILEY, SMITH, and BENTON, Circuit Judges.

————————

RILEY, Circuit Judge.

This case involves a multi-national dispute involving sales of large printing press equipment in the United States. Ultimately, this appeal asks whether a foreign corporation merely competed with a domestic manufacturer in the printing press industry in the United States, or whether the foreign corporation intended to injure or destroy the printing press industry in the United States by dumping underpriced products onto that market.

Goss International (Goss), a United States corporation, sued Tokyo Kikai Seisakusho (TKSC), a Japanese corporation, its United States subsidiary, TKS (U.S.A.) (collectively, TKS), and other foreign corporations and their United States subsidiaries (collectively, the other defendants), alleging violations of the Antidumping Act of 1916 (1916 Act), 15 U.S.C. § 72.[1] Before trial, the other

—————————

[1]Unlawful dumping occurs when a foreign person "commonly and systematically . . . sell[s] . . . [imported] articles within the United States at a price substantially less than the actual market value or wholesale price of such articles [less incidental import expenses], at the time of exportation to the United States, in the principal markets of the country of their production . . . [when such] acts be done with the intent of destroying or injuring an industry in the United States." 15 U.S.C. § 72.

defendants moved to dismiss Goss's complaint because it failed to allege predatory intent as required under domestic antitrust law.  Concluding the 1916 Act does not require predatory intent, the district court[2] denied the motions to dismiss.  The other defendants then settled with Goss and are no longer parties to this lawsuit.  Goss's claims against TKS were tried to a jury, which found TKS unlawfully dumped printing press equipment onto the United States market in violation of the 1916 Act.  The jury awarded $10,539,949 in damages to Goss.  Because the 1916 Act provides for treble damages, the district court[3] tripled the award and entered judgment against TKS for $31,619,847.  The district court also awarded attorney fees to Goss in the amount of $3,484,158.  TKS filed a motion for new trial and a motion for judgment as a matter of law.  The district court denied both of TKS's post-trial motions.

TKS appeals, contending (1) the district court misinterpreted the 1916 Act as not requiring proof of predatory intent; (2) the district court misinstructed the jury on the essential elements of Goss's claims; (3) sufficient evidence does not support the jury's verdict on Goss's claims involving the price erosion theory; (4) the district court erroneously excluded evidence about Goss's reputation in the newspaper industry; (5) sufficient evidence does not support the jury's verdict that TKS dumped products onto the United States printing press market that were comparable to the products TKS sold in Japan; and (6) the district court misapplied the statute of

In 2004, Congress repealed the 1916 Act.  Miscellaneous Trade & Technical Corrections Act of 2004, Pub. L. No. 108-429, § 2006(a), 118 Stat. 2434, 2597.  However, Congress specifically excluded any actions pending at the time of the repeal.  Id. § 2006(b).  Because Goss's claims against TKS were pending at the time Congress repealed the 1916 Act, the repeal does not affect this appeal.

[2]The Honorable Michael J. Melloy, then United States District Judge for the Northern District of Iowa, now United States Circuit Judge for the Eighth Circuit Court of Appeals.

[3]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

limitations and erroneously allowed Goss to recover on a time-barred claim. We affirm.

## I. BACKGROUND

Because Goss secured a jury verdict, we provide the following background based on the record viewed in a light most favorable to the jury's verdict and by giving all reasonable inferences to Goss. See Racicky v. Farmland Indus., Inc., 328 F.3d 389, 393 (8th Cir. 2003).

Goss manufactures and supplies large newspaper printing presses, newspaper printing press additions, and other printing press systems for sale to large newspapers. TKS manufactures large newspaper printing presses and newspaper printing press additions in Japan, and then distributes its products around the world, including in the United States. A typical large printing press system is over 100 feet long, stands four or five stories tall, and weighs two million pounds. Once a large printing press is installed, it oftentimes is referred to as an installed base. Because the installed base, i.e, the actual printing press system, is so large and expensive, many customers prefer to purchase printing press additions from the manufacturer of the original printing press system. This is often referred to as the installed base advantage. Because of the size and cost of these systems, newspapers often use their existing printing press systems for decades, and only update the capability of the presses by purchasing printing press additions. When a newspaper decides to buy a large printing press system or a printing press addition, price is the primary factor; in head-to-head battles between manufacturers dealing in comparable equipment, price can be the determinative factor. However, non-price factors also can be important in choosing a manufacturer. This case deals exclusively with printing press additions.

The United States market for large printing press equipment is rather small, with only about ten sales taking place each year. Because the market is so compact, lost orders–even one per year–can impact a substantial portion of a manufacturer's

business. Beginning in the 1970s, Goss became the dominant manufacturer of newspaper printing press equipment in the United States. By the 1990s, Goss was the only domestic manufacturer of large printing presses in the United States. Goss's dominance of the United States printing press industry continued into the late 1990s. However, in 2000, Goss did not make a single sale of printing press equipment.

TKS enjoys a huge market in Japan for its printing press equipment. TKS broke into the United States printing press market in the 1970s. By the late 1970s or early 1980s, Goss noticed TKS was a major foreign competitor in the United States market. By the 1990s, TKS had a significant installed base in the United States of around sixty-two printing presses. In the 1980s, TKS landed major newspaper customers in the United States. These customers included *The Wall Street Journal*, *The Washington Post*, and the *Newark Star-Ledger*. TKS also established a critical relationship with *The Dallas Morning News*, which TKS planned to use to showcase its products to other United States newspapers. From 1985 to 2000, TKS's market share of the United States printing press industry fluctuated from highs of 22.4% in 1986 and 20.4% in 1998 to 0% in 2000.

From January 1991 to July 2000, TKS sold over $125,000,000 worth of printing press additions to five United States newspapers. According to Goss's expert witness at trial, all of these sales were dumped, i.e., they were "common and systematic," and TKS sold these "product[s] in the U.S. at a price that was substantially below the market value of the similar product in Japan." When TKS, a major competitor in the United States printing press market, lowered its prices, customers expected Goss to lower its prices as well.

This appeal focuses on three separate sales of printing press additions to three separate United States newspapers. Goss presented evidence showing it lost the sale of printing press additions to *The Dallas Morning News* in 1996 because TKS won the contract based on dumped prices. Goss also presented evidence that, although it

successfully won the sales of printing press additions to the *Orlando Sentinel* and the *Newark Star-Ledger* in 1997, it lowered its prices to compete with TKS's dumped prices. That is, Goss showed the contract costs of the additions with these two newspapers, but also showed the jury "the price that Goss would have made–or would have received but for TKS offering bids at its dumped prices."

In 1994, TKS executed a contract with *The Dallas Morning News* for the sale of three printing press additions for $8,505,348. The contract also provided an option for *The Dallas Morning News* to buy two more additions at a later date for $5,670,232. In a letter dated April 25, 1995, *The Dallas Morning News* exercised its option to purchase the two additions. TKS later determined the option agreement obligated it to supply *The Dallas Morning News* "the two additional units at a clearly dumped price." In response, TKS asked *The Dallas Morning News* to agree to an option price of $7,429,774 for the additional units, with the understanding TKS would rebate the increased amount to *The Dallas Morning News*. In a letter dated June 13, 1996, TKS wrote to *The Dallas Morning News* informing it of this agreement. In late 1996, TKS and *The Dallas Morning News* executed a contract for the sale of the two additions, and TKS delivered those additions. TKS then rebated $2,200,000 to *The Dallas Morning News*, with $1,000,000 being reimbursed by check and $1,200,000 being reimbursed in the form of free equipment. In a letter to TKS (U.S.A.) dated August 12, 1996, and referencing the option contract with *The Dallas Morning News* for the two additions, TKSC's overseas sales manager wrote, "Today we received with a big surprise a copy of the letter dated June 13, 1996. . . . there should not be such a document (stating TKS/USA will issue a credit and or cash in the amount of $2,200,000 to The Dallas Morning News before December 31st, 1996) approved by 3 parties (DMN, TKS/USA and TKS, Ltd)."

In discussing how to memorialize the agreement that TKS would reimburse *The Dallas Morning News* $2,200,000 for the additional contract amount for the option items so the original 1994 price would end up being the total price, TKS's attorney

wrote *The Dallas Morning News*, "I HOPE WE CAN DISPENSE WITH ANY WRITTEN CONFIRMATION OF THIS 'GENTLEMAN'S AGREEMENT'. A HAND-SHAKE DEAL IS THE BEST." A confidential fax dated August 1996 references the June 13, 1996, letter, asking if "a copy or duplicate original copy of the letter" exists and, "[i]f so, we suggest that such a copy must be collected and destroyed." A subsequent confidential fax reiterates the command to "destroy all copies of the said original letter that are located at TKS (USA)." TKSC's overseas sales manager sent *The Dallas Morning News* a copy of a fax describing the $2,200,000 in rebates, and then instructed him, "This fax copy is only for your information. I did not talk about this old story with TKS people. . . . Please destroy this fax letter after you read it." Finally, a document admitted at trial showed TKSC advised TKS (U.S.A.) "all documents and *Faxes* relevant to [*The Dallas Morning News* dumping] matter should be disposed of whenever possible, but it's probably inevitable that some copies remain."

In 1997, Goss won a contract for the sale of printing press additions to the *Newark Star-Ledger* for $16,995,000, but contended that represented "a loss position of about 5 million dollars." Goss's national sales manager testified that, if Goss "had not been dealing with dumped pricing, [it] could [have] derive[d] a price between 27 and 25 million dollars for this order." Goss's sales manager further testified, "If we had not been dealing with dumped prices from [TKS], we should have been able to turn that type of profit from this order. Instead of being a loss position of 5 million, we should have made . . . 3 million dollars profit."

In a letter dated January 21, 1997, from TKS (U.S.A.) to TKSC regarding the competition for the sale of printing press additions to the *Newark Star-Ledger*, TKS (U.S.A.) stated, "[W]e feel that [the *Newark Star-Ledger*] will feel that $9.4 million plus installation will be too high a price and may reluctantly get proposals from Goss and [another manufacturer for the printing press additions]. If so, we are in danger of losing [the] order." Thus, TKS (U.S.A.) offered the following strategy:

> We would provide a written proposal showing conversion parts price of $1.0 million more–$5,200,648, and **verbally** tell customer that if dumping problem was not involved, our [equipment] would be $8,431,481. . . . Therefore, we would tell [the *Newark Star-Ledger* representative] if he will permit us to add $1.0 million to $8,431,481–making the Sales Agreement price $9,431,481, we would reduce conversions price by $1.0 million to become $4,200,648.

(emphasis in original).

Also in 1997, Goss outbid TKS on the sale of printing press additions to the *Orlando Sentinel*. Referring to the sale of those additions, Goss's national sales manager testified the contract price totaled $13,215,650. However, this witness stated that, had it not been for TKS's dumped prices impacting this order, Goss could have sold these additions for $14,938,000.

Goss's expert witness studied TKS's pricing of its printing press additions offered in the United States, and determined TKS offered these printing press additions at dumped prices. This witness testified Goss's four sales of printing press additions while competing head-to-head against "TKS during [the 1990s] when TKS was offering dumped prices" were made at lower prices "than they would have been but for TKS offering those [dumped] prices."

In a letter dated December 17, 1993, TKSC's manager of its overseas sales department wrote to TKS (U.S.A.) regarding a sale to *The Dallas Morning News*, and stated,

> If Goss wants to sling mud at TKS in such dirty strategy (special 25% discount or one tower as gift to sell 3 towers) to destroy TKS, I believe TKS must do something like an eye for an eye, a tooth for a tooth. Look here, Goss, TKS will show them a thing or two–three–four . . . . . in

Japan, Asia, U.S.A. & in any other territory *until TKS wins completely this survival game*."

(emphasis added).

In a videotaped deposition, a TKS (U.S.A.) senior manager of customer service stated TKS considered Goss the enemy. In a letter from TKSC to TKS (U.S.A.) dated July 14, 1994, concerning another sale of printing press additions, TKSC stated, "[P]lease do your best to *get this order by all means*. It must be very beautiful, if we can see two (2) TKS [printing press additions on top of] Goss presses in East coast and in West coast in U.S.A." (emphasis added).

In a letter dated September 27, 1996, from TKSC to TKS (U.S.A.) addressing a German manufacturer's impact on Goss's business, TKS stated,

> Our good rival [i.e., the German manufacturer] is fighting bravely, we must admit it. Well done!! I am very happy to hear from you that Goss is in a vulnerable position at present . . . having no U.S. backlog in a factory–having to issue $300M in bonds. They invited their own misfortunes. It is no more than they deserved. Congratulations!!

TKSC's assistant general manager of the sales division testified he was "happy" when he heard the news in June 1996 that Goss was closing its main manufacturing plant for a couple of weeks and laying off employees.

In March 2000, believing TKS and the other defendants had been unlawfully dumping printing press additions onto the United States market in violation of the 1916 Act, Goss sued TKS and the other defendants in the Northern District of Iowa. Focusing on the allegations against TKS, Goss alleged

> [f]or years [TKS] ha[s] offered and sold Newspaper Presses and Newspaper Press additions in the United States at prices substantially

less than their actual market value in other countries, after adding freight, tariffs, and other charges and expenses. [TKS has] undertaken this conduct–called 'dumping'–in a deliberate effort to destroy or injure the United States Newspaper Press industry.

At trial, Goss maintained ten sales of printing press additions were affected by TKS's unlawful dumping. Specifically, Goss argued TKS won six sales based on unlawful dumping, while Goss won four sales by eroding its profit margin to compete with TKS's unlawful dumping. This theory is referred to as the price erosion theory. Because of statute of limitations issues, the jury was asked whether TKS violated the 1916 Act on six specific sales of printing press equipment–two sales won by TKS, and four sales won by Goss.

After an eleven-day trial, the jury found TKS engaged in unlawful dumping. To make this determination, the jury found Goss proved (1) TKS "commonly and systematically imported or sold, or caused to be imported or sold, newspaper press printing units within the United States at a price substantially less than the actual market value or wholesale price, at the time of exportation to the United States, of comparable printing units in Japan," (2) "such acts were done with the intent of injuring or destroying an industry in the United States," and (3) "Goss was injured in its business or property by reason of [TKS]'s conduct." Although Goss claimed it lost two sales of printing press additions because of TKS's unlawful dumping, the jury found for Goss only on *The Dallas Morning News* claim. On this claim, the jury concluded Goss's damages included lost profits in the amount of $840,720, and the opportunity cost of capital relating to lost profits in the amount of $551,770. Goss also claimed TKS's unlawful dumping caused Goss to suffer price erosion damages on four sales Goss actually won. The jury found for Goss only on its sales to the *Orlando Sentinel* and to the *Newark Star-Ledger*. On the *Orlando Sentinel* claim, the jury found Goss's damages included lost profits in the amount of $1,060,420, and the opportunity cost of capital relating to lost profits in the amount of $637,366. On the *Newark Star-Ledger* claim, the jury found Goss's damages included lost profits in the

-10-

amount of $4,844,019, and the opportunity cost of capital relating to lost profits in the amount of $2,605,654. Based on these findings, the jury's total damages award to Goss amounted to $10,539,949.

Because the 1916 Act provides for treble damages, 15 U.S.C. § 72, the district court entered judgment in Goss's favor and against TKS for $31,619,847. The district court also awarded statutory attorney fees to Goss in the amount of $3,484,158. TKS sought post-trial relief by filing a motion for a new trial and a motion for judgment as a matter of law. In its motion for new trial, TKS contended (1) the jury verdict was against the weight of the evidence; (2) the district court issued improper jury instructions; and (3) the district court made erroneous evidentiary decisions. In its motion for judgment as a matter of law, TKS argued (1) Goss failed to meet its burden of proof; and (2) there was no evidentiary basis for the jury's finding of injury. The district court denied both motions. TKS appeals.

## II.    DISCUSSION

We review de novo the district court's denial of TKS's motion for judgment as a matter of law. Racicky, 328 F.3d at 393. We ask whether the record contains sufficient evidence to support the jury's verdict in Goss's favor. Id. When considering this sufficiency of the evidence question, we examine the evidence in a light most favorable to Goss and view all inferences in its favor. Id. We remain vigilant when reviewing a jury's verdict, knowing judgment as a matter of law in the face of a jury's verdict is appropriate only when the evidence points in one direction and no reasonable inferences support Goss's claims. Id.

When reviewing a district court's denial of a motion for a new trial, we afford great deference to the district court and will not reverse without a showing that the district court clearly abused its discretion. Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 867 (8th Cir. 2004). The standard is even more strenuous "[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of

the evidence," as the denial of the motion under these circumstances "is virtually unassailable on appeal." Id.

### A. Anti-Dumping Act of 1916

Nearly ninety years ago, Congress passed the 1916 Act to outlaw dumping practices intended to injure or destroy United States industry:

> It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, *commonly and systematically* to import, sell or cause to be imported or *sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production*, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided*, That such act or acts be *done with the intent of destroying or injuring an industry in the United States*, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.
>
> Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.
>
> Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and *shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee*.

The foregoing provisions shall not be construed to deprive the proper State courts of jurisdiction in actions for damages thereunder.

15 U.S.C. § 72 (emphasis added).

### 1. The 1916 Act and Any Intent Requirement

TKS urges us to interpret the 1916 Act to require predatory intent along the lines the Supreme Court enunciated in Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993). In Brooke Group, 509 U.S. at 219-24, the Court interpreted the price discrimination provision of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, as requiring predatory intent such that "a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs," and "that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." However, TKS does not urge us to adopt "the entire Brooke Group predatory pricing test, but only that the [1916] Act is governed by the general standard articulated in Brooke Group that a defendant must act to 'eliminate or retard competition' to gain control over prices." See Brooke Group, 509 U.S. at 222 (holding the essence of a price discrimination claim is that a "business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market"). In a doomsday prediction, TKS contends the district court's interpretation of the 1916 Act, which rejected an additional element of predatory intent, "improperly converted the [1916 Act] . . . into an appallingly anti-competitive law that domestic manufacturers can and will use to punish and thereby stifle legitimate competition from foreign

manufacturers."[4]  Thus, we ask whether the plain language of the 1916 Act requires a showing of predatory intent.[5]

---

[4]Of course, TKS's argument has little weight in light of Congress's repeal of the 1916 Act.  To our knowledge, this litigation is the lone pending lawsuit under the 1916 Act in the Eighth Circuit.

[5]The Government of Japan filed an amicus brief in this appeal, contending the 1916 Act violates the United States's obligations under a 1994 World Trade Organization (WTO) agreement concerning antidumping legislation.  Specifically, Japan argues the 1916 "Act violates the WTO agreement and every action allowed to proceed under the [1916] Act exacerbates the United States' breach of its obligations under the agreement."  Japan notes the European Union already has been authorized by the WTO to enact countermeasures against the United States based on the application of the 1916 Act to a German corporation.  Japan threatens,

> If the verdict in this case is upheld, Japan may have no choice but to seek authorization from the [WTO's Dispute Settlement Body] to impose its own countermeasures against the United States, which could include the imposition of additional duties on U.S. imports into Japan.  Thus, the failure of the United States to comply with the WTO ruling and recommendation could result in an 'arms buildup of protectionist measures' that could threaten to disrupt trade and commerce between Nations.

Japan argues our court should interpret the 1916 Act to minimize the impact on the United States's foreign relations and to be consistent with the United States's obligations to the WTO.  Specifically, Japan urges this court to interpret strictly the 1916 Act's intent element to require proof of predatory intent to "minimize[] the United States' breach of its obligations under the WTO Agreement."  Although we recognize this dispute under the 1916 Act may have international ramifications, those potential ramifications cannot transform the 1916 Act into something it is not. Following our judicial duty, our resolution of the intent requirement under the 1916 Act is based on American law and not foreign policy.  As discussed below, our reading of the 1916 Act forces us to conclude it does not require proof of predatory intent as contemplated in antitrust laws.

-14-

The district court confronted this predatory intent issue. <u>Goss Graphic Sys., Inc. v. MAN Roland Druckmaschinen AG</u>, 139 F. Supp. 2d 1040, 1045 (N.D. Iowa 2001). Judge Melloy concluded the "contention that a plaintiff must show predatory intent . . . is simply not supported by the plain and unambiguous language of the 1916 Act." <u>Id.</u> at 1046. Other district courts also have held the 1916 Act does not require proof of predatory intent as contemplated by the Supreme Court in <u>Brooke Group</u>. <u>See</u>, <u>e.g.</u>, <u>Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co.</u>, 35 F. Supp. 2d 597, 602-05 (S.D. Ohio 1999); <u>Geneva Steel Co. v. Ranger Steel Supply Corp.</u>, 980 F. Supp. 1209, 1217 (D. Utah 1997). Persuaded by these decisions from three district courts, we likewise hold the 1916 Act does not require predatory intent as outlined in <u>Brooke Group</u>.

In rejecting a predatory intent element for these types of claims under the 1916 Act, the district court followed the sound reasoning in <u>Geneva Steel</u>. We are similarly convinced. The district court in <u>Geneva Steel</u> confronted the same arguments TKS makes in this appeal. We wholeheartedly adopt the <u>Geneva Steel</u> discussion and resolution of the intent requirement under the 1916 Act. <u>Geneva Steel</u>, 980 F. Supp. at 1212-25. Had Yogi Berra said, "Don't improve something you can't improve," we surely would follow his advice on this issue. Thus, we are content to summarize the salient points made by the district court in <u>Geneva Steel</u>.

The district court in <u>Geneva Steel</u> was asked, as we are today, whether the 1916 Act requires proof of predatory intent, and the defendants in that case essentially argued the 1916 Act requires predatory intent because it "is an antitrust act, not a protectionist act; that is, the [1916] Act is designed to protect competition, not competitors." <u>Id.</u> at 1214. Noting the plaintiff presented "a straightforward argument [that] . . . [t]he 1916 Act . . . means precisely what it says, nothing more or less," and agreeing "[t]he 1916 Act means what its plain language says," the district court held "the 1916 Act is not limited only to antitrust injury or predatory price discrimination[, but] is also designed to protect United States industry." <u>Id.</u> at 1215. To underscore

-15-

this holding, the district court declared "there is no need to resort to means of secondary interpretation such as legislative history or reference to other statutes," because "[t]he language of the [1916] Act is remarkably straightforward." Id. at 1216.[6]

The Geneva Steel district court recognized the 1916 Act has "traditional antitrust prohibitions" that "seek to protect competition and are not directed at protecting competitors." Id. at 1215. Specifically, the court noted the 1916 Act's antitrust provisions prohibit dumping done with the intent to "'restrain[] or monopoliz[e] any part of the trade and commerce'" in the subject market. Id. (quoting 15 U.S.C. § 72). The court also recognized the 1916 Act "clearly and literally prohibits non-antitrust and non-predatory pricing conduct," referring to the 1916 Act's prohibition against dumping with the intent to "'destroy[] or injur[e] an industry in the United States.'" Id. at 1215, 1217 (quoting 15 U.S.C. § 72). Thus, the district court relied on the 1916 Act's plain language to hold:

> By the words it chose, Congress protected United States industries from unfair dumping, whether the dumper possessed predatory intent or not. The intent required is the intent to "injure" a domestic United States industry. When the [1916] Act states that it is unlawful to sell dumped goods with the specific intent to injure a United States industry, it means precisely that. Defendants want to add the limitation that such injury can only occur if predatory pricing is involved, but the [1916] Act simply does not say so.

---

[6]Although the district court declared the clarity of the 1916 Act's plain language precluded further statutory analysis, the district court nonetheless proceeded to conduct such an analysis. See id. at 1216-25.

Id. at 1217.[7]  In the end, the court held "the Antidumping Act of 1916 is susceptible of only one clear meaning under the circumstances of the instant case.  Plaintiff has adequately plead its case by alleging that the Defendants sold foreign steel in the United States at prices substantially less than the actual market value or wholesale price of such steel products in the countries of production, all with the specific intent to injure the United States Steel Industry."  Id. at 1225; see also Wheeling-Pittsburgh Steel, 35 F. Supp. 2d at 603 (rejecting a predatory intent element under the 1916 Act, and holding the plaintiff "must show that the [foreign] defendants sold their product at a price level prohibited by the statute with the intent to injure or destroy [a United States] industry").  We cannot agree more.[8]

---

[7]See also id. at 1223 (applauding a law student's analysis of the 1916 Act's plain language as not requiring predatory intent because "it is encouraging to read such commentary that recognizes the plain meaning of the words of the 1916 Act") (quoting Note, Rethinking the 1916 Antidumping Act, 110 Harv. L. Rev. 1555, 1557-58 (1997)).

[8]For support of its predatory intent argument in this case, TKS relies heavily on decisions rendered during the extensive In re Japanese Electronic Products Antitrust Litigation cases of the 1970s and 1980s.  See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); In re Japanese Elec. Prods. Antitrust Litig., 807 F.2d 44 (3d Cir. 1986);  In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 319 (3d Cir. 1983); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F. Supp. 1190 (E.D. Pa. 1980); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 402 F. Supp. 251 (E.D. Pa. 1975).  We give little weight to TKS's litigation position that these courts required predatory intent as advanced by TKS, as these courts did not specifically address the same issue we address here.  However, even if these courts adopted a predatory intent element as advanced by TKS in this litigation, we would reject such an additional element under the 1916 Act for the same reasons the district court in Geneva Steel rejected such arguments.  See Geneva Steel, 980 F. Supp. at 1217-20.

## 2. Jury Instructions

TKS argues that, even if predatory intent is not a required element under the 1916 Act, it nevertheless "is entitled to a new trial because the District Court's jury instructions on the intent requirement were fundamentally flawed." For Goss to recover on its antidumping claims against TKS, the district court instructed the jury Goss had to prove the following elements:

> First, that [TKS] commonly and systematically imported or sold, or caused to be imported or sold, newspaper press printing units within the United States at a price substantially less than the actual market value or wholesale price, at the time of exportation to the United States, of comparable printing units in Japan.
>
> Second, that such acts were done with the intent of injuring or destroying an industry in the United States.
>
> Third, that Goss was injured in its business or property by reason of [TKS]'s conduct.

To clarify the intent requirement, the district court instructed the jury on the meaning of intent under the 1916 Act:

> Intent is defined by the law as that purpose with which a person acts. The phrase "intent of injuring" does not mean an evil desire or a motive of causing harm. To act with an "intent of injuring" means to act with an intent to cause pecuniary loss, rather than simply to win sales and earn profits for oneself. The phrase "intent of destroying" means to act with an intent to put a United States industry out of business.

Part of this instruction finds its genesis in section 6.18.656 of the Eighth Circuit Manual of Model Criminal Jury Instructions, in which "intent to injure" is defined as "to act with intent to cause pecuniary loss."

Before trial, Goss and TKS each submitted proposed instructions defining intent. Goss proposed the following jury instruction: "Intent is defined by the law as that purpose with which a person acts. The phrase 'intent of injuring' does not mean an evil desire or a motive of causing harm. To act with an 'intent of injuring' means to act with an intent to cause pecuniary loss." TKS, on the other hand, proposed the following jury instruction:

> TKS's importation of large newspaper printing presses cannot violate the anti-dumping statute unless TKS imported the units with a specific intent to injure or destroy the large newspaper printing press industry in the United States. "Intent" means that it was the actor's conscious objective to injure or destroy the large newspaper printing press industry.

> A foreign seller who is motivated solely by a desire to make a profit for itself does not have a specific intent to injure or destroy a United States industry. The foreign seller's knowledge that its sales will capture business away from its United States competitors does not, standing alone, demonstrate a specific intent to injure the United States industry.

It is apparent the district court blended the parties' proposed instructions to craft the intent instruction.

We review the district court's decision to give its particular instructions for an abuse of discretion. Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 976 (8th. Cir. 2005). When reviewing the instructions given by the district court, "we ask 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'" Id. at 976-77 (quoting Jones v. Swanson, 341 F.3d 723, 734 (8th Cir. 2003)). As long as the district court correctly instructed the jury on the substantive issues, we allow the district court to exercise its sound discretion in selecting "the actual 'form and language of jury instructions.'" Id. at 977 (quoting Jones, 341 F.3d at 734). We will not reverse a jury verdict based on erroneous instructions unless the errors affected a

-19-

party's substantial rights.  Id.  Thus, erroneous jury instructions necessitate a new trial only when we conclude the errors "'misled the jury or had a probable effect on the jury's verdict.'"  Burry v. Eustis Plumbing & Heating, Inc., 243 F.3d 432, 434 (8th Cir. 2001) (quoting E.I. du Pont de Nemours & Co. v. Berkley & Co., Inc., 620 F.2d 1247, 1257 (8th Cir. 1980)).

The district court's instruction on intent is the most troubling issue on appeal.  TKS's argument that the district court allowed the jury to find TKS violated the 1916 Act simply by trying to win sales for itself is interesting, but ultimately unavailing.  To instruct the jury properly on the elements required to prove a dumping claim under the 1916 Act, the district court simply needed to ask the jury whether TKS sold printing press equipment in the United States at dumped prices with the intent to injure or destroy the United States printing press industry.  Although the district court made this straightforward task a bit more difficult by giving its intent instruction, we conclude the district court did not abuse its wide discretion in formulating the intent instruction.

The district court properly instructed the jury on the elements of Goss's antidumping claim, and we must remember this fact when cherry-picking one instruction–the intent instruction–out of the district court's entire set of instructions to the jury.  Before the jury considered whether TKS acted with the requisite intent, it already had found TKS "commonly and systematically" dumped underpriced goods onto the United States printing press market.  Thereafter, the jury simply was trying to determine whether TKS's dumping was done with the intent to injure or destroy the United States printing press industry.  A reasonable jury can understand this requirement without much assistance from the court.  In essence, this might be a scenario where lawyers, in their attempt to define a legal principle, might be better off trusting the knowledge and common sense of lay persons.

Regardless, we cannot view the intent instruction in a vacuum filled only with law, unaccompanied by common sense and everyday reason. Rather, we must view the instruction along with the evidence adduced at trial. Here, the evidence showed Goss *was* the United States printing press industry. If a foreign manufacturer of printing press equipment sold printing press additions at dumped prices in the United States with the intent to injure or destroy Goss, then that foreign manufacturer violated the 1916 Act because it acted with the requisite intent to injure or destroy the United States printing press industry. In essence, the jury was asked whether TKS intended to injure or destroy Goss.

The intent instruction correctly focused the jury on the quintessential question of why TKS dumped underpriced products onto the United States printing press market. The district court told the jury TKS must have acted "with an intent to cause pecuniary loss." In the same sentence, the district court explained the requisite intent was something different than TKS's intent "simply to win sales and earn profits for [it]self." The jury was instructed that dumping products onto the United States printing press market was not unlawful if TKS intended to win sales and earn profits. The district court told the jury such dumping was unlawful only if TKS intended to cause Goss pecuniary loss, i.e., to injure or destroy Goss. TKS could have dumped printing press additions onto the United States market for its own benefit to increase sales and profits, and the 1916 Act would have had nothing to say about it. However, when TKS dumped products onto the United States market to injure–and even destroy–the sole American domestic manufacturer in that industry, the 1916 Act reared its head to prohibit such conduct.

Although the intent instruction is arguably confusing if read by itself, the instruction is clarified when viewed as part of the entire set of instructions and accompanied by the evidence presented at trial. In the end, we are convinced the instructions focused the jury's attention on determining why TKS dumped printing press additions onto the United States market–to sell its products and make profits, or

to injure or destroy Goss. And, as discussed below, the jury had more than sufficient evidence to conclude TKS dumped products to injure or destroy Goss, i.e., to cause Goss pecuniary loss.

In addition to concluding the district court did not erroneously instruct the jury, we also conclude any instructional error did not change the outcome of the trial. Viewing the instructions as a whole, the jury was asked whether TKS's dumping practices were intended to injure or destroy Goss, which solely represented the United States printing press industry. This straightforward task was certainly one a reasonable juror could tackle with little assistance from lawyers. Furthermore, the jury's verdict reveals it was not confused by the district court's instructions, as the jury found for Goss only on three of Goss's six dumping claims. This measured result showed, in part, the jury was not confused by the instructions. We also note TKS presented no evidence or argument that the jury actually was confused by the instruction on intent.

### B. Sufficiency of the Evidence
#### 1. Intent to Injure or Destroy United States Industry

As alluded to above, the jury was asked a simple question–did Goss prove TKS dumped printing press additions onto the United States market with the intent to injure or destroy the printing press industry. TKS seems to challenge the jury's finding that Goss succeeded in proving intent. Therefore, we will consider whether sufficient evidence supports that finding.

After the jury found TKS commonly and systematically dumped underpriced printing press additions onto the United States market, the jury was asked whether TKS's dumping was intended to injure or destroy the United States printing press industry. Again, as Goss represented the entire United States printing press industry, the jury had to decide whether TKS intended to injure or destroy Goss. The jury found TKS acted with such an intent. Viewing the evidence in a light most favorable

to the jury's verdict and affording all reasonable inferences in Goss's favor, we conclude the evidence supports the jury's finding.

Once the jury found TKS commonly and systematically dumped underpriced printing press additions onto the United States market, the jury was directed to consider why TKS engaged in such behavior, i.e., the jury was asked to consider TKS's intent. In delving into TKS's intent, the jury no doubt looked at TKS's own words and deeds. Several glaring pieces of evidence support the verdict. First, TKS believed Goss was the "enemy," not just a foreign competitor. And TKS was not interested just to compete with Goss–TKS wanted to destroy Goss. As seen in the December 17, 1993, letter, TKS wanted to "win[] completely this survival game." To us, this evidence tends to prove TKS was on a mission to make Goss–the sole domestic printing press manufacturer–extinct. Extinction sounds much like destruction, and is rather strong evidence of TKS's intent to injure or destroy Goss.

Second, TKS was pleased to hear Goss was suffering serious financial difficulties and was in a vulnerable position. After years of dumping millions of dollars of its products onto the United States market, TKS learned Goss was forced to close its main manufacturing plant and lay off its employees. TKS reveled in this news. This evidence also reflects TKS's intent to injure or destroy Goss.

Third, TKSC instructed its United States subsidiary to win a particular order for printing press additions "by all means." Although this evidence strongly supports the dumping element, it, too, supports a finding of intent. The jury reasonably could have concluded TKS intended to do anything to drive Goss out of the United States printing press business.

Fourth, TKS attempted to cover up its dumping practices. Specifically, Goss presented evidence to the jury that TKS (1) knew it faced dumping problems because of its conduct; (2) made secret rebate deals with newspapers to conceal dumping

-23-

issues; (3) tried to destroy or conceal evidence of its dumping practices; and (4) sought to avoid written agreements when trying to skirt antidumping laws. When this conduct is viewed in light of the evidence listed above, the jury reasonably could have concluded TKS knew it was engaging in unlawful conduct, but nevertheless continued to violate the antidumping laws in its desire to injure or destroy its enemy–Goss.

Although we recognize the 1916 Act differentiates between fierce, foreign competition and destructive dumping done with the requisite intent, we believe the district court properly submitted this dispute to the jury–especially on the intent issue. In the end, the jury heard evidence TKS dumped over $125,000,000 worth of printing press additions onto the United States market in the 1990s. The 1916 Act compelled the jury to consider why TKS chose to offer its products at dumped prices in the United States. The district court's intent instruction asked the jury to decide whether TKS dumped printing press additions onto the United States market in a competitive bid to win sales and earn profits, or whether TKS engaged in dumping with the intent to injure or destroy Goss. The record supports a finding TKS acted with the requisite intent.

### 2.    Price Erosion Theory

Although TKS readily admits Goss's expert witness "provided detailed assertions that TKS's successful sales were at dumped prices," TKS contends Goss presented no evidence to support the jury's verdict on its price erosion claims, i.e., Goss presented no evidence TKS's dumped prices caused Goss's losses on the *Newark Star-Ledger* and *Orlando Sentinel* contracts. Thus, we address whether sufficient evidence supports the jury's finding that TKS's common and systematic dumping of printing press additions with the intent to injure or destroy the United States printing press industry caused Goss to suffer price erosion damages on its sales to the *Newark Star-Ledger* and the *Orlando Sentinel*.

An antidumping claim under the 1916 Act necessarily involves at least two competitors–one foreign and one domestic. The foreign competitor violates the 1916 Act when it dumps underpriced products with the requisite intent, which, in turn, causes the domestic competitor to lower its prices. See Helmac Prods. Corp. v. Roth (Plastics) Corp., 814 F. Supp. 560, 574-75 (E.D. Mich. 1992) (stating "a [domestic] business is injured when it must lower its prices in response to its [foreign] competitor's unfair practices"). Thus, price erosion damages are recoverable in situations where a domestic manufacturer lowers its prices in response to a foreign manufacturer's violation of the 1916 Act. See id. at 575 (holding price suppression damages are recoverable under the 1916 Act even when a domestic manufacturer does not lose sales to a foreign competitor offering dumped prices).

We conclude the record contains sufficient evidence to support the jury's verdict in Goss's favor on its price erosion claims involving the *Newark Star-Ledger* and the *Orlando Sentinel*. According to the evidence adduced at trial, TKS sold over $125,000,000 worth of printing press additions in the United States in the 1990s. Goss's expert witness testified all of these sales were at dumped prices. The evidence further demonstrated Goss was forced to react to this glut of dumped products by lowering its prices. Of course, hindsight is 20/20, and we now know Goss probably lowered its prices too much during the closed bidding process in response to TKS's unlawful dumping practices, i.e., TKS's dumped prices were higher than Goss's sale prices. However, Goss's inability to predict precisely how drastic TKS was cutting its prices (with the intent to injure or destroy Goss) does not afford TKS a sanctuary on appeal, as TKS's unlawful conduct prompted Goss to react. We simply ask whether sufficient evidence supports the jury's finding that TKS's common and systematic dumping with the intent to injure or destroy Goss caused Goss to lower its prices on the *Newark Star-Ledger* and *Orlando Sentinel* sales. It does.

### 3.     Comparable Products

TKS also argues it "is entitled to judgment as a matter of law because Goss did not present sufficient evidence to demonstrate that TKS was selling 'articles within the United States at a price substantially less than the actual market value or wholesale price of *such* articles' in Japan." (citing 15 U.S.C. § 72) (emphasis added).  The Third Circuit Court of Appeals has recognized the 1916 Act requires "proof that a price differential exists between two comparable products, one of which is imported or sold in the United States and the other of which is sold in the exporting country."  In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 319, 324 (3d Cir. 1983).  However, the Third Circuit also held "the 1916 Act does not require a comparison only between identical products."  Id. at 325.

The parties did not dispute this standard, and the district court also agreed, as seen by its instruction to the jury that Goss had to prove TKS "commonly and systematically imported or sold, or caused to be imported or sold, newspaper press printing units within the United States at a price substantially less than the actual market value or wholesale price, at the time of exportation to the United States, of comparable printing units in Japan."  The district court then defined "comparable":

> the technological differences between products should be compared in terms of customer use and preference and marketability.  Products do not need to be identical to be comparable.  To be comparable, products must be more than functional equivalents or in the same generic category.  The comparison also must take into account the technological significance of any difference between the products and the differences in production costs caused by such differences.  That products sold in Japan may have technical components that make them work in Japan while products sold in the United States have technical components that make them work in the United States does not make the products noncomparable.

TKS does not contend these instructions are wrong. Instead, TKS simply asserts sufficient evidence does not support the jury's findings that the products at issue were comparable.

Goss presented evidence that TKS's dumped products in the United States were "essentially the same" as the products TKS sold in Japan. One Goss witness testified "the TKS additions sold in Japan and the USA are directly comparable in terms of technology, construction, basic design, and value." According to testimony heard by the jury, a common printing press addition TKS sold in the United States "is absolutely identical between the–those units that are shipped in the US and those units that are shipped to Japan." Goss's expert witness also compared the printing press additions TKS sold in the United States with the equipment TKS sold in Japan, and concluded the equipment was comparable. Finally, the evidence further showed TKS itself realized it had dumping concerns, especially involving the sales to *The Dallas Morning News* and to the *Newark Star-Ledger*. All of this evidence required the district court to submit the comparability question to the jury, and the jury found the printing press additions TKS sold to *The Dallas Morning News*, the *Newark Star-Ledger* and the *Orlando Sentinel* were comparable to the equipment TKS sold in Japan. We will not disturb the jury's verdict.

## C. Reputation Evidence

TKS contends it "is entitled to a new trial because the District Court erred in ruling that evidence of Goss's poor reputation and poor financial situation should be excluded as irrelevant under Federal Rules of Evidence 401 and 402." Specifically, TKS sought to present evidence to the jury concerning "Goss's poor reputation in the newspaper community." TKS's argument on appeal stresses Goss lowered its prices, not in response to TKS's unlawful dumping, but in response to Goss's poor reputation in the newspaper industry.

At trial, the district court specifically questioned TKS's attorneys about the evidence relating to the sales at issue to determine the relevancy of TKS's reputation evidence:

> THE COURT: There are twelve specific sales that are at issue here. Is there going to be evidence from any of these customers of TKS that they made their decision to buy a TKS product in part because of the reputation that Goss had for not taking care of its customers in the mid 1990s to late 1990s?
>
> [TKS ATT'YS]: Mr. Sheehan from the Dow Jones will testify that the 1998 Dow Jones purchase – among the things he was aware of during the negotiation with Goss was disastrous installations it had with the same kind of unit with other newspapers.
>
> . . . .
>
> THE COURT: I don't see how any of this is relevant, except documents that may come in through [the single newspaper] that relate specifically to what they knew or what they were thinking at the time they decided to buy the TKS product over the Goss product. But otherwise, none of the rest of this [generalized reputation evidence] is going to come in because it's not relevant.

We review the district court's evidentiary rulings for an abuse of discretion, but never lose sight that "[a]n allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result." Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 833 (8th Cir. 2005) (citations and quotations omitted).

TKS has sharpened its argument on appeal, but it does not convince us we must reverse the district court's evidentiary decisions and grant a new trial. Like the district court, we do not believe TKS laid any foundation to show Goss's generalized reputation in the newspaper industry was relevant to why the newspapers at issue in this case purchased printing press additions from either TKS or Goss. Furthermore, TKS did not present evidence to show Goss lowered its prices on the sales at issue to fend off its poor reputation in the newspaper industry. Mere speculation could not suffice. The bottom line is the district court did not abuse its considerable discretion in deciding generalized reputation evidence would serve no purpose other than to divert the jury's attention away from the relevant evidence and issues.[9]

## D.    Statute of Limitations[10]

TKS's final argument is the district court misapplied the four-year statute of limitations to Goss's allegations that TKS violated the 1916 Act when it sold printing press additions to *The Dallas Morning News*, contending Goss's claims relating to TKS's sales of printing press additions to *The Dallas Morning News* were time-barred. Specifically, TKS maintains "the limitations period [on this claim] commenced in 1994 because the agreement to deliver two color tower additions in 1996 arose from an obligation established in the contract executed by TKS and [*The Dallas Morning News*] in 1994." TKS further argues that, "[a]lthough [*The Dallas*

---

[9]We also note the district court allowed TKS to present evidence to the jury that Goss had customer service issues with some newspapers. The district court also allowed TKS to ask a newspaper representative how Goss's reputation impacted sales to that newspaper. Thus, when TKS offered relevant evidence on Goss's reputation–as opposed to generalized evidence employing speculation–the district court correctly ruled it admissible.

[10]The 1916 Act does not contain a limitations period. The district court addressed this issue and determined, based on similarities between the 1916 Act and section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 15, a four-year statute of limitations applied. The parties do not challenge this determination.

*Morning News*] and TKS renegotiated the contract in 1996, the terms of the agreement remained effectively unchanged from those established in 1994."

We conclude the district court did not misapply the four-year statute of limitations by allowing Goss to present evidence and recover damages on TKS's 1996 renegotiated contract with *The Dallas Morning News*. The evidence showed that, after TKS was faced with dumping violations arising out of its 1994 contract with *The Dallas Morning News*, TKS sought to renegotiate the contract. In 1996, TKS and *The Dallas Morning News* renegotiated the terms of the 1994 contract to avoid a sale of printing press additions at dumped prices. The evidence showed TKS induced *The Dallas Morning News* to renegotiate the 1994 contract by offering a secret rebate so *The Dallas Morning News* still would end up receiving the dumped price. This manipulative conduct to sell the additions at dumped prices, which occurred in 1996, violated the 1916 Act, and was clearly within the statute of limitations. To be blunt, TKS's renegotiated contract with *The Dallas Morning News* in 1996 was as much a violation of the 1916 Act as was the 1994 contract.[11]

---

[11]Alternatively, we conclude TKS waived its statute of limitations argument during the following exchange at trial:

> THE COURT: Which sales, then, did you call–did you determine–or do you argue within the statutory period?
>
> [GOSS ATT'Y]: It would be the Dallas Morning News 1996 . . .
>
> . . . .
>
> THE COURT: Does the Defense agree that the statute of limitations is appropriately applied, as indicated by the Plaintiff, to [The] Dallas Morning News [sale in 1996]. . . ?
>
> [TKS ATT'YS]: . . . I believe so, Your Honor. . . . That's correct.

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's judgment in Goss's favor.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's view that the weight of persuasive precedent holds that Goss need not plead or prove specific predatory intent to prevail under the Anti-dumping Act of 1916. However, I disagree regarding the adequacy of the district court's jury instruction on intent. Competition is the very hallmark of American free enterprise. Limitations upon it should not be lightly imposed or enforced. As noted by *Geneva Steel Co. v. Ranger Steel Supply Corp.*, 980 F. Supp. 1209, 1224 (D. Utah 1997), while the 1916 Act clearly protects competitors as well as competition, it neither criminalizes nor prohibits normal competition or capitalism. TKS is certainly entitled to place its products into the American press market, as long as it does not do so with the prohibited intent to injure or destroy the United States press industry. Intent to injure under the 1916 Act requires more than an intent to cause pecuniary loss.

We review the district court's jury instructions for abuse of discretion "looking to the instructions as a whole to determine whether they fairly submitted the issues to

---

THE COURT:     So there's really no disagreement between you on the damages? . . . Which sales or - -

[TKS ATT'YS]:   That's correct.

Furthermore, in a pretrial submission to the district court, TKS wrote, "Following a lengthy and convoluted negotiation between TKS and [*The Dallas Morning News*] during 1996, the parties agreed to rescind the option clause of the 1994 contract, and to enter into a new contract for two towers."

the jury." *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005). In instructing the jury on intent in this case, the district court stated:

> Intent is defined by the law as that purpose with which a person acts. The phrase "intent of injuring" does not mean an evil desire or a motive of causing harm. To act with an "intent of injuring" means to act with an intent to cause pecuniary loss, rather than simply to win sales and earn profits for oneself. The phrase "intent of destroying" means to act with an intent to put a United States industry out of business.

The district court erred in instructing the jury that "intent of injuring" only requires proof of an "intent to cause pecuniary loss." TKS maintains that a party cannot intend to win sales for itself without also intending to cause pecuniary loss to its competitors. Within the unique facts of this case, I believe they are correct. In a very limited, specialized market such as the press industry, winning a sale from a competitor, even by legitimate efforts, would likely result in "pecuniary loss" to another seller. Something more than reduced sales must be shown to justify the imposition of treble damages under the Act.

Therefore, because the district court erred in its instruction that "intent of injuring" means "intent to cause pecuniary loss," a new trial should be granted.

_____